LOCAL 705, International Brotherhood of Teamsters Health and Welfare Fund, Plaintiff-Appellant, v. FIVE STAR MANAGERS, L.L.C., Defendant-Appellee.

First District (2nd Division)    No. 1—99—3394

Opinion filed August 15, 2000.

James P. Daley and David M. Novak, both of Bell, Boyd & Lloyd, L.L.C., of Chicago, for appellant.

Bruce R. Meckler, Janet R. Davis, and Eric D. Stubenvoll, all of Meckler, Bulger & Tilson, of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

This appeal arises from a suit for declaratory judgment brought by plaintiff Local 705 International Brotherhood of Teamsters Health & Welfare Fund (H&W) against its insurer, Connecticut Specialty Insurance Company (Connecticut Specialty), and its insurer's agent, Five Star Managers, L.L.C. (Five Star). The suit seeks declarations that H&W is entitled to coverage for losses totaling more than $20 million incurred pursuant to a settlement agreement reached in an underlying suit brought by H&W's sister fund, the Local 705 International Brotherhood of Teamsters Pension Fund (the Pension Fund), against H&W. Pursuant to Five Star's section 2—615 (735 ILCS 5/2—615 (West 1992)) motion to dismiss, the trial court dismissed Five Star from the suit, leaving Connecticut Specialty as the remaining defen-

dant. This appeal is taken by plaintiff from the decision dismissing Five Star. For the reasons set forth below, we affirm that dismissal.

## BACKGROUND

On November 4, 1997, the Pension Fund brought suit against H&W in the United States District Court for the Northern District of Illinois, seeking recovery of $16,511,985 which it claimed was improperly transferred from the Pension Fund to H&W between 1991 and 1995 in violation of fiduciary duties imposed by the Employee Retirement Income Security Act (29 U.S.C.A. § 1001 *et seq.* (West 1999)) (ERISA). H&W thereupon notified its carrier, Connecticut Specialty, of the Pension Fund's complaint, demanding coverage and tendering its defense of the suit to its insurer. Connecticut Specialty denied coverage and declined to undertake the defense of the litigation or to pay H&W's attorney fees, alleging as its ground that the funds had knowledge of this claim prior to the coverage period.

H&W filed its initial verified complaint for declaratory judgment against Connecticut Specialty and Five Star on May 29, 1998. In that complaint, H&W sought declarations that it was entitled to a defense in the underlying Pension Fund litigation and, if H&W were found liable, that it was entitled to be indemnified for its damages.

While H&W's declaratory judgment action was pending, the underlying Pension Fund litigation was resolved on December 22, 1998, when the federal district court entered an order approving a settlement agreement in the case and reducing the terms of the settlement to a judgment. Under the terms of the settlement agreement, H&W agreed to pay $20 million to the Pension Fund, plus $182,000 in attorney fees to the attorney of the Pension Fund. The $20 million total consisted of $16,511,985.48 that was previously transferred from the Pension Fund to H&W, plus $3,488,014.52 in interest. The settlement agreement between H&W and the Pension Fund was entered into pursuant to an earlier settlement agreement reached in September 1998 by H&W and the Pension Fund with the United States Department of Labor, which had investigated the fund transfers and alleged that they were in violation of ERISA.

About three months later, Five Star was dismissed from H&W's original declaratory judgment action pursuant to a section 2—619 motion (735 ILCS 5/2—619 (West 1992)), which Five Star had filed. The trial court concluded that H&W had failed to plead that it incurred liability in the underlying litigation sufficient to implicate coverage beyond Connecticut Specialty's $10 million layer. However, the court noted that subsequent to the filing of the original complaint, the underlying litigation had been settled, and it granted H&W leave to amend.

On May 11, 1999, H&W filed its verified amended complaint in two counts for declaratory judgment against Connecticut Specialty and Five Star, pursuant to section 2—701 of the Code of Civil Procedure (735 ILCS 5/2—701 (West 1992)). The amended complaint makes essentially the same allegations as the original, with the exception of additional allegations as to the settlement agreement reached in the underlying Pension Fund litigation. The amended complaint alleges that in January 1997, H&W and the Pension Fund sought to replace their existing fiduciary liability insurance.[1] On January 17, 1997, the funds applied for such insurance with Connecticut Specialty, requesting "occurrence"[2] coverage in the amount of $25 million and a policy period of January 31, 1997, to January 31, 1998. On February 10, 1997, Five Star, an insurance brokerage company acting on behalf of Connecticut Specialty, issued an insurance binder to the funds with Connecticut Specialty on those terms. However, the Connecticut Specialty policy itself (policy No. FLO100315), which was subsequently issued to both H&W and the Pension Fund, provided coverage only to a liability limit of $10 million. H&W alleges that, in reliance upon the Five Star binder, the funds made premium payments on the Connecticut Specialty policy and canceled their other coverages.

Count I of H&W's two-count amended complaint is brought exclusively against Connecticut Specialty and not against Five Star. In that count, H&W seeks a declaration that Connecticut Specialty is obligated to provide coverage and payment of H&W's loss in the underlying litigation, and that it is obligated to pay H&W's attorney fees and costs incurred in defense of that litigation. Five Star is joined as an additional defendant in count II, which seeks declaratory relief amounting to an increase in coverage under the express terms of the Connecticut Specialty policy so that the relief provided is coextensive with the $25 million stated in Five Star's binder. Specifically, count II seeks a declaration that Connecticut Specialty is obligated to provide that coverage or in the alternative that Five Star is obligated to provide the full $25 million of coverage or that Five Star is obligated to provide the $15 million difference between the Connecticut Specialty policy's $10 million in coverage and the $25 million figure.

---

[1]Prior to 1997, a National Union Fire Insurance policy providing the funds with such coverage included an insured-versus-insured exclusion in which the insurer disclaimed liability for payments in connection with any claim brought by an insured against an insured. It is undisputed that the Connecticut Specialty policy at issue contains no such exclusion.

[2]The policy defines "occurrence" as a "wrongful act" or "interrelated wrongful acts."

Among the exhibits attached to H&W's amended complaint are copies of the following: H&W's original insurance application to Connecticut Specialty; Five Star's $25 million insurance binder; Connecticut Specialty's fiduciary liability policy No. FLO100315 limiting liability to $10 million; the complaint in the underlying Pension Fund suit; correspondence between H&W and Connecticut Specialty and their respective counsel regarding coverage and defense of the underlying litigation; and the federal district court's order approving and reducing to judgment the terms of the settlement agreement in the underlying suit. Included in that last exhibit are copies of the settlement agreement with the Pension Fund and the earlier settlement agreement reached by H&W and the Pension Fund with the United States Department of Labor.

On August 23, 1999, the trial court granted Five Star's section 2—615 (735 ILCS 5/2—615 (West 1992)) motion to dismiss H&W's amended complaint for declaratory judgment. The court concluded that only the $3,488,014.52 in interest plus the $182,000 in attorney fees implicated insurance coverage and that the remaining $16,511,985.48 was "merely a transfer of funds and not a loss incurred by plaintiff." The court therefore concluded that it did not need to resolve whether the $3,670,014.52 in interest and attorney fees was recoverable from Five Star since that amount would be subsumed under the $10 million of coverage which the carrier had admitted to. The trial court reasoned that any opinion as to coverage beyond that level would be advisory only and therefore H&W had failed to state a claim for declaratory judgment against Five Star. The court also found, pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)), that there was no just cause to delay enforcement or appeal of its order. This appeal followed.

## DISCUSSION

H&W argues on appeal that the trial court erred when it ruled that H&W sustained no loss for coverage purposes when it returned the amount of $16,511,985 originally transferred from the Pension Fund. H&W contends that such payments are losses within the scope of the plain language of the Connecticut Specialty policy. We disagree.

As noted, the settlement agreement between H&W and the Pension Fund calling for return of those funds was reached pursuant to the complaint of the Pension Fund in the underlying litigation. According to that complaint, the $16,511,985 transferred from the Pension Fund to H&W between 1991 and 1995 was in violation of ERISA fiduciary duties. That money was drawn from employer contributions made on behalf of the Pension Fund's 7,500 participants, including

2,600 who were participants in the Pension Fund but not in H&W and thus were ineligible for H&W benefits allegedly financed with the transferred monies. The settlement agreement between the Pension Fund and H&W was in turn mandated by the settlement agreement reached between the parties and the Department of Labor, which likewise required H&W to refund the money on grounds that it was taken from the Pension Fund in violation of ERISA.

The policy at issue provides that Connecticut Specialty

"will pay on behalf of the 'insured' the 'ultimate net loss' which the 'insured' shall become legally obligated to pay as a result of any 'wrongful act' committed or attempted or allegedly committed or attempted during the 'coverage period' by an 'insured' or by any person for whose 'wrongful acts' the 'insured' is legally responsible."

The term "loss" is defined as "the act or fact of losing: failure to keep possession: DEPRIVATION." Webster's Third New International Dictionary 1338 (1986). Here, there is no question that the sole basis upon which H&W paid out the settlement amount was the Pension Fund's claim that H&W was required to return those monies which it had no right to possess in the first place. Such a payment can hardly be termed a loss. Nor can such payment create a deprivation any more than any borrower can be said to suffer a deprivation from being required to repay an indebtedness.

While neither of the parties cites cases on point, there are three cases from other jurisdictions in which that same rationale was applied. In *Nortex Oil & Gas Corp. v. Harbor Insurance Co.*, 456 S.W.2d 489, 493-94 (Tex. Civ. App. 1970), the appellant (Nortex) sought recovery from its insurer for sums paid in settlement of claims for conversion and unjust enrichment resulting from Nortex's allegedly wrongful appropriation of oil. The Texas Court of Civil Appeals held that the amount paid was not a recoverable loss, stating that "[a]n insured *** does not sustain a covered loss by restoring to its rightful owners that which the insured, having no right thereto, has inadvertently acquired." *Nortex*, 456 S.W.2d at 494.

The same rationale was applied in *Town of Brookhaven v. CNA Insurance Cos.*, No. CV—86—3569 (E.D.N.Y. February 24, 1988), where the plaintiff town sought a declaration that its insurer was required to indemnify it for payments to be made as a result of three actions filed against it by various school districts. In those actions the school districts alleged that the plaintiff distributed tax revenues to the districts more slowly than required by law. The payments to be made as a result of those actions amounted to the interest earned by the plaintiff during the period when it unlawfully withheld funds from the

school districts. The court in *Brookhaven* held that the plaintiff would suffer no recoverable loss as a result of those disbursements. According to the court:

> "That interest constitutes the benefit enjoyed by the town by virtue of its improper withholding of money which should have been earning interest on behalf of the districts. The repayment of those funds to the school districts merely results in the retroactive distribution of tax revenues in accordance with the [law]. *Since the town was never entitled to the use of those funds, disgorgement of them does not cause 'injury or damage' to the town within the meaning of the policy.*" (Emphasis added.) *Brookhaven*, slip op. at ___.

Thus because the plaintiff in *Brookhaven* was merely compelled in the underlying actions to return kept funds to which it was never entitled, its repayment or restitution of those funds was held not to be a recoverable loss.

Likewise, in *Central Dauphin School District v. American Casualty Co.*, 493 Pa. 254, 426 A.2d 94 (1981), the Supreme Court of Pennsylvania held that a school district that imposed an unlawful tax could not recover from its insurer some $529,000 in refunds the district was forced to repay to its taxpayers. The concurring opinion observed that it "would defy common sense" to claim that refunds of unlawfully collected taxes resulted in a loss. *Dauphin*, 493 Pa. at 261, 426 A.2d at 98. "The school district simply cannot 'lose' that to which it was not legally entitled." *Dauphin*, 493 Pa. at 262, 426 A.2d at 98.

Notwithstanding the foregoing, H&W argues that its payment to the Pension Fund, even if it is termed restitution, is included within the broad language of the Connecticut Specialty policy because the payment was made as a result of wrongful acts allegedly committed by insureds, *i.e.*, the alleged breaches of ERISA fiduciary duties by insured trustees and others. In further support of its contention, H&W points to the policy's definition of "ultimate net loss," which is defined as "the total sum which the 'insured' *** shall become legally obligated to pay on account of each 'claim' made against them for a 'wrongful act' *** for which coverage applies, including, but not limited to, damages, judgments, settlements, costs and 'claims expenses.' " H&W thus asserts that losses arising from settlement agreements, as is the case here, are included within the scope of the Connecticut Specialty policy. We reject this contention.

As noted by the court in *Brookhaven*, which looked at policy language similar to that cited in the instant case, "[t]he broad language of the policy does not alter the conclusion." *Brookhaven*, slip op. at ___. The plain and ordinary meaning of "loss" cannot be ignored. H&W "simply cannot lose that to which it was not legally

entitled." *Brookhaven*, slip op. at ___. Moreover, the policy language cited by H&W is not as broad as might have been implied. The second sentence of the definition of "ultimate net loss" (not quoted by H&W) excludes from that provision "matters uninsurable under the law pursuant to which this Coverage Form is construed." H&W's repayment of $16,511,985.48 to which it was not legally entitled can well be included among such "matters uninsurable."

We therefore conclude that H&W's payment to the Pension Fund is not within the coverage of the Connecticut Specialty policy and is thus not recoverable. There is no dispute as to the terms of the coverage to be provided under either Five Star's binder or the Connecticut Specialty policy, but only as to the amount that was to be provided. Therefore, if this claim is not recoverable under the terms of the coverage provided by Connecticut Specialty, then the same reasoning would render it unrecoverable from Five Star. Moreover, we need not make a determination as to whether the interest and attorney fees are recoverable since this appeal applies only to Five Star and the nearly $4 million in interest and attorney fees is well within the $10 million layer of coverage provided by Connecticut Specialty. Any determination as to whether the interest and attorney fees are recoverable under the Connecticut Specialty policy would at this point be advisory. See *Clyde Savings & Loan Ass'n v. May Department Stores*, 100 Ill. App. 3d 189, 192, 426 N.E.2d 955, 958 (1981) (noting that central issue in action seeking declaratory relief is whether "there is a substantial controversy between the parties having adverse legal interests of sufficient immediacy and reality to warrant issuance of declaratory judgment").

Accordingly, we need not consider H&W's other two arguments on appeal: (1) that Five Star breached its implied warranty of authority as the agent of Connecticut Specialty in issuing a binder for $25 million of coverage, thus rendering Five Star liable for the $15 million difference between Connecticut Specialty's $10 million policy and the $25 million stated in Five Star's binder; and (2) that the subsequent failure to procure $25 million in coverage constituted a breach of contract, making Five Star liable for the entire $25 million in coverage. The first of these arguments fails because, since any question of liability remains only as to the interest and attorney fees totaling less than $4 million, Five Star's liability would in no event exceed the $10 million in coverage already provided under the policy of Connecticut Specialty. With respect to H&W's second argument that because of a breach of contract Five Star is liable for the entire $25 million of primary coverage as a co-insurer with Connecticut Specialty, H&W has failed to provide us with adequate argument or authority to warrant

overturning the trial court's decision in that regard. See *Holmstrom v. Kunis*, 221 Ill. App. 3d 317, 325, 581 N.E.2d 877, 882 (1991) ("A reviewing court is entitled to have issues clearly defined with pertinent authority cited and coherent arguments presented; arguments inadequately presented on appeal are waived") (construing Supreme Court Rule 341(e)(7) (177 Ill. 2d R. 341(e)(7))).

H&W cites *Zannini v. Reliance Insurance Co.*, 147 Ill. 2d 437, 454, 590 N.E.2d 457, 464 (1992), for the proposition that binders constitute enforceable insurance contracts. However, that does not mean that Five Star, as Connecticut Specialty's agent, would be liable for the entire $25 million in coverage. On the contrary, we read *Zannini* as concluding that where a party, acting as an agent of an insurer and not a broker, issues a binder, it is the insurer that is bound (not the agent). That is particularly true where, as here, the principal (Connecticut Specialty) is disclosed. See Restatement (Second) of Agency § 320 (1958). H&W makes no argument that Five Star was a broker and not an agent. Indeed, in its brief on appeal H&W argues the opposite, noting that the Connecticut Specialty application form (attached to the amended complaint) lists Connecticut Specialty's address as being in care of Five Star in Chicago, and contending that such a listing shows that Five Star was Connecticut Specialty's agent.

Even if Five Star were deemed a broker, the result would be the same. Under general contract principles, an insurance binder constitutes a promise to provide interim coverage until actual coverage is procured. See *Zannini*, 147 Ill. 2d at 454, 590 N.E.2d at 464; 12A J. Appleman & J. Appleman, Insurance Law & Practice § 7230, at 169 (rev. 1981); 2 Couch on Insurance 2d § 14:26, at 48-50 (rev. 1984). That promise would have been breached only as to the difference between the $10 million layer of coverage provided by Connecticut Specialty and the $25 million stated in Five Star's binder. Thus the broker would have satisfied the promise as to the original $10 million in coverage but not as to the additional $15 million, which as indicated is not in issue here. *Cf. Lake County Grading Co. of Libertyville, Inc. v. Great Lakes Agency*, Inc., 226 Ill. App. 3d 697, 701, 589 N.E.2d 1128, 1131 (1992) ("[T]he proper measure of damages for the breach of a contract to procure insurance is generally determined by the terms of the policy which the broker failed to procure"). Under this result, Five Star's liability, if any, would remain only as to the difference between the initial $10 million and the $25 million requested. As to that amount, Five Star would be in an analogous position to that of an excess carrier for whom liability can be invoked only after the primary coverage has been exhausted. See *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 653-54, 643 N.E.2d 1226,

1262 (1994) (holding that plaintiff must exhaust all available primary coverage before proceeding against excess carrier when that carrier's policy contains an other insurance clause). H&W thus provides us with no reason to overturn the trial court's judgment as to Five Star's liability for the full $25 million in coverage. Accordingly, there is no reason to keep Five Star in the case where the approximately $4 million in interest and attorney fees, whose recoverability has not yet been determined, would be within the $10 million in coverage provided by Connecticut Specialty.

For the reasons set forth above, the trial court's granting of Five Star's motion to dismiss H&W's declaratory judgment complaint is affirmed.

Affirmed.

COUSINS, P.J., and McNULTY, J., concur.