**GENZYME CORPORATION, Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY,**
Defendant.

**Civ. Action No. 08cv10988–NG.**

United States District Court,
D. Massachusetts.

Sept. 28, 2009.

Howard Anglin, Marc E. Rindner, Daniel J. Standish, Wiley Rein LLP, Washington, DC, Barbara A. O'Donnell, Catherine N. O'Donnell, Zelle McDonough & Cohen, LLP, Boston, MA, for Defendant.

Robert G. Jones, Katherine A.K. Mumma, Peter L. Welsh, Ropes & Gray LLP, Boston, MA, for Plaintiff.

### MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION TO DISMISS

GERTNER, District Judge.

## I. INTRODUCTION

On September 22, 2002, Federal Insurance Company ("Federal") issued a director and officer and corporate liability insurance policy (the "Executive Protection Policy") to Genzyme Corporation ("Genzyme"). Genzyme claims that this policy covers losses it incurred in litigating and settling a shareholder class action. Federal disagrees, and has moved for the Court to dismiss Genzyme's complaint, which seeks damages for Federal's denial of coverage. For the reasons set forth below, the Court **GRANTS** Federal's motion to dismiss Genzyme's complaint for failure to state a claim upon which relief can be granted (document # 12). Fed. R. Civ. Pro. 12(b)(6).

## II. FACTUAL BACKGROUND

In ruling on Federal's motion to dismiss, the Court assumes the truth of all well-pleaded facts and gives Genzyme the benefit of all reasonable inferences therefrom. *Vernet v. Serrano–Torres*, 566 F.3d 254, 258 (1st Cir.2009).

### A. Genzyme and its Tracking Stock Capital Structure

Genzyme is a biotechnology corporation organized under the laws of the Commonwealth of Massachusetts. (Compl. ¶ 4.) From 1994 to 2003, Genzyme's capital structure included a series of "tracking stock" designed to track the performance of particular business divisions rather than the company as a whole.[1] *Id.* ¶ 17. From December 2000 through June 2003, three series of Genzyme tracking stock were outstanding, one each for the General Division (which traded under the ticker symbol GENZ), the Biosurgery Division (which traded as GZBX), and the Molecular Oncology Division (which traded as GZMO). *Id.* Each of these tracking stocks was registered under the Securities Exchange Act

---

1. In its complaint, Genzyme explains that:
 [a] tracking stock is a series of the common stock of a corporation that is designed to track the performance of a particular business division, rather than the company as a whole. The corporation allocates the performance of programs, assets and liabilities to its divisions, but the corporation, not the division, owns the divisional assets and is responsible for its liabilities. Although a tracking stock is designed and intended to reflect the financial performance of the discrete division to which it corresponds, the division itself is not a separate legal entity. (Compl. 5 n. 3.).

of 1934 and traded under its own symbol on the NASDAQ. *Id.* However, the divisions to which the tracking stocks corresponded were not distinct legal entities. Each division was owned directly by Genzyme, and holders of the tracking stock were merely holders of a single class of Genzyme's common stock. *Id.* Thus, holders of all tracking stock had voting rights in the Genzyme Corporation, not in any particular division.

## B. The Elimination of Genzyme's Tracking Stock Structure

Genzyme's Articles of Organization ("Articles") allowed the corporation to eliminate its tracking stock structure by requiring Biosurgery Division shareholders and Molecular Oncology Division shareholders to exchange their shares either for General Division shares or for cash. *Id.* ¶ 18. On May 8, 2003, Genzyme announced that its board of directors had decided to exercise the optional exchange provisions in its Articles and thereby eliminate the corporation's tracking stocks. *Id.* ¶ 19. In particular, Genzyme announced that it would exchange each Biosurgery Division and Molecular Oncology Division share for a certain number of General Division shares, leaving the General Division shares as the only outstanding common stock of the corporation. *Id.* ¶¶ 19–20. Throughout this opinion, the Court will refer to this exchange of Biosurgery Division and Molecular Oncology Division shares for General Division shares as the "Share Exchange."

Genzyme's Articles called for each Biosurgery Division and Molecular Oncology Division shareholder to receive shares of General Division stock equal to 130% of the "fair market value" of the Biosurgery and Molecular Oncology Division stock in the Share Exchange. The Articles further defined "fair market value" as the average closing price of GZBX or GZMO stock during a twenty-day period commencing thirty days prior to the announcement of the Share Exchange. Under this formula, Biosurgery Division shareholders received 0.04914 shares of GENZ stock for each share of GZBX stock when the Share Exchange was carried out on June 30, 2003. Genzyme Corp., Form 8–K (May 8, 2003).[2]

## C. The Underlying Litigation

The Share Exchange proved to be unpopular among many Biosurgery Division shareholders. Soon after the Share Exchange was announced, a number of shareholder lawsuits were filed against Genzyme and several of its officers and directors. (Compl. ¶¶ 24–41.) Eventually, the U.S. District Court for the Southern District of New York certified a class action, and on August 6, 2007, Genzyme agreed to settle all of the class members' claims by making a one-time payment of $64 million. *Id.* ¶¶ 35, 41. It is this settlement payment for which Genzyme is now seeking partial indemnification from Federal.

The current dispute between Genzyme and Federal must be understood within the context of the claims made by the plaintiffs in the Southern District of New York class action.[3] The Fourth Amended

---

2. The Court may take judicial notice of this publicly filed document in ruling on Federal's motion to dismiss. *In re Stone & Webster, Inc., Securities Litigation,* 253 F.Supp.2d 102, 128 n. 11 (D.Mass.2003).

3. The Fourth Amended Class Action Complaint is integral to the claims set forth in Genzyme's complaint against Federal. With-

out understanding the nature of the claims presented in the underlying litigation, the Court cannot determine whether Genzyme's settlement payment constitutes an insurable loss. Thus, the Court may properly consider the allegations made in the Fourth Amended Class Action Complaint without converting Federal's motion into one for summary judg-

Class Action Complaint notes that Genzyme's Biosurgery Division tracking stock was a product of its merger with Biomatrix, Inc., an independent biomaterials company. The merger combined Biomatrix's assets with those of Genzyme's Surgical Products and Tissue Repair Divisions to create the Biosurgery Division. Fourth Am. Class Action Compl. ¶ 42, *Lewis v. Termeer*, No. 03–Civ–4014 (S.D.N.Y. Dec. 30, 2005). Pursuant to its merger agreement with Biomatrix, Genzyme paid $245 million in cash for 28.38% of Biomatrix's outstanding shares and then issued one share of Biosurgery Division stock in exchange for each remaining Biomatrix share. *Id.* ¶ 45. According to the plaintiffs in the underlying litigation, Genzyme promised at the time of its merger with Biomatrix to operate Biosurgery as an independent, "self-sustaining business." *Id.* ¶¶ 49–56. However, the plaintiffs in the underlying litigation alleged that Genzyme reneged on this promise. *Id.* ¶ 57. Instead of seeking to maximize Biosurgery's profitability for the benefit of holders of Biosurgery Division shares, Genzyme's directors and officers allegedly schemed to depress the market value of GZBX stock so that it could fold the Biosurgery Division into the General Division at an exchange ratio that would be favorable to General Division shareholders. *Id.* ¶ 18.

To see how such a scheme might work, one need only look at the Share Exchange formula set forth in Genzyme's Articles. The lower the fair market value of a Biosurgery Division share, the fewer General Division shares needed to complete the Share Exchange. General Division shareholders, of course, would want to execute the Share Exchange by issuing as few new General Division shares to Biosurgery Division shareholders as possible. Issuing new shares has a dilutive effect on existing shareholders. It reduces the amount of corporate earnings attributable to each share and may reduce the amount of dividends and other distributions received by each shareholder. Executing the Share Exchange when the Biosurgery Division's stock was undervalued by the market would be a boon to General Division shareholders. The General Division shareholders would obtain the benefits of the Biosurgery Division's assets and profits while experiencing minimal dilution of their existing equity stake. Although the plaintiffs in the underlying litigation raised a number of claims under federal and state law,[4] their claims revolved around one central allegation: Genzyme's directors and officers conspired to benefit General Division shareholders at the expense of Biosurgery Division shareholders in the Share

---

ment. *See Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir.2000) (noting that a court in ruling on a Rule 12(b)(6) motion "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment" (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996))).

4. In particular, the plaintiffs' Fourth Amended Class Action Complaint contained seven counts: (1) a claim against all defendants under Section 10(b) of the Securities Exchange Act and Rule 10b–5; (2) a claim against Genzyme under Section 20A of the Exchange Act; (3) a claim against the officer-defendants, Henri Termeer and Michael Wyzga, under Section 20(a) for control persons liability; (4) a claim against the director-defendants for breach of fiduciary duty; (5) a claim against Genzyme for breach of the implied covenant of good faith and fair dealing with respect to its Articles of Organization; (6) a claim against Genzyme for express breach of its merger agreement with Biomatrix; and (7) a claim against Genzyme for unfair and deceptive trade practices.

Exchange.[5] *Id.* ¶¶ 18–19.

### D. The Executive Protection Policy

On September 22, 2002, Defendant Federal Insurance Company issued Genzyme a director and officer and corporate liability insurance policy (the "Executive Protection Policy").[6] The policy covers claims made during the period of September 22, 2002, to September 22, 2003, the period during which plaintiffs' complaint in the underlying litigation was filed in the Southern District of New York. (Compl. ¶ 9.) It limits Federal's liability to $10,000,000 and is subject to a $15,000,000 deductible. *Id.* Insuring Clauses 2 and 3 of the policy are the coverage clauses relevant to this dispute. Insuring Clause 2 covers losses for which Genzyme grants indemnification to its directors and officers, and Insuring Clause 3 covers losses suffered by Genzyme on account of securities claims. Since the particular language of these clauses is important, the Court quotes them in full.

Insuring Clause 2 provides:

[Federal] shall pay on behalf of [Genzyme] all Loss for which [Genzyme] grants Indemnification to each Insured Person [i.e., Genzyme's officers and directors], as permitted or required by law, which the Insured Person has become legally obligated to pay on account of any Claim first made against him, individually or otherwise, during the Policy Period ... for a Wrongful Act

committed, attempted, or allegedly committed or attempted by such Insured Person before or during the Policy Period.

Insuring Clause 3 provides:

[Federal] shall pay on behalf of [Genzyme] all Loss for which it becomes legally obligated to pay on account of any Securities Claim first made against it during the Policy Period ... for a Wrongful Act.

The term "loss," as used in the policy, is defined as the "total amount which [Genzyme or its officers or directors] become [ ] legally obligated to pay on account of each Claim and for all Claims in each Policy Period ... made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments, settlements, costs and Defense Costs." The policy explicitly states that the term "loss" does not include "matters uninsurable under the law pursuant to which [the insurance policy] is construed." In addition, the policy contains a "Bump Up" provision that states:

[Federal] shall not be liable under insuring Clause 3 for that part of Loss, other than Defense Costs, which is based upon, arising from, or in consequence of the actual or proposed payment by any Insured Organization of allegedly inadequate or excessive consideration in connection with its purchase of securities issued by any Insured Organization.[7]

---

**5.** The Fourth Amended Class Action Complaint alleges that Genzyme's officers and directors had a reason for benefitting General Division shareholders at the expense of Biosurgery Division shareholders. According to the plaintiffs in the underlying litigation, Genzyme's top officers and directors personally profited from the Share Exchange because they owned large amounts of stock in Genzyme's General Division and thus benefitted from the favorable exchange ratio. Fourth

Am. Class Action Compl. ¶ 20, Lewis, No. 03–Civ–4014.

**6.** Genzyme attached the Executive Protection Policy to its complaint as Exhibit A.

**7.** According to Federal, "[t]he term 'Bump Up' is used in the D & O [directors' and officers'] insurance industry to describe litigation seeking to increase or 'bump up' the consideration paid for a security." (Def.'s

Genzyme claims that its settlement payment to the plaintiffs in the underlying class action (the "Settlement Payment") is an insurable loss under the Executive Protection Policy. Federal disagrees. As the analysis below demonstrates, their dispute turns entirely on the meaning of the words "loss" and "purchase" as used in the policy.

## III. PROCEDURAL HISTORY

Genzyme filed a three-count complaint against Federal on May 19, 2008. Count I alleges that Federal breached its contract with Genzyme by denying coverage of its expenses and settlement payment in the underlying class action. Count II charges Federal with breach of the implied covenant of good faith and fair dealing, and Count III alleges that Federal has engaged in unfair and deceptive acts and practices, in violation of Mass. Gen. Laws chs. 93A and 176D. Federal has moved to dismiss Genzyme's complaint under Federal Rule of Civil Procedure 12(b)(6) on the grounds that it fails to state a claim upon which relief can be granted.

## IV. STANDARD OF REVIEW

In deciding whether to grant Federal's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine whether Genzyme has stated a claim upon which relief can be granted. The Court must accept as true all well-pleaded facts in the complaint, with all reasonable inferences drawn in Genzyme's favor. *Vernet v. Serrano–Torres,* 566 F.3d 254, 258 (1st Cir.2009). Genzyme's factual allegations, however, must be more than speculative and must constitute more than mere labels and conclusions. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

## V. DISCUSSION

 The parties agree that Massachusetts law governs the Court's inquiry into the scope of the Executive Protection Policy. Unfortunately, the parties do not cite, and the Court is not aware of, any Massachusetts statutes or cases that directly address the issues now before the Court. Thus, the Court must attempt to predict how a Massachusetts trial court would rule if faced with the same case. In conducting this inquiry, the Court may take into account how courts in jurisdictions other than Massachusetts have handled similar issues. *See Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.,* 547 F.3d 48, 51–52 (1st Cir.2008).

Federal claims that it has no duty to pay Genzyme under the Executive Protection Policy because (1) the Settlement Payment does not constitute an insurable "loss," and (2) even if the Settlement Payment could be construed as an insurable "loss," Federal has no obligation to pay because the Settlement Payment falls within the Bump–Up exclusion.

The Court's analysis of Federal's arguments is complicated by two factors. First, the claims asserted by the plaintiffs in the underlying class action were not identical. The district court in the underlying litigation certified two sub-classes: one composed of all holders of Biosurgery Division stock on May 8, 2003, who then participated in the Share Exchange on June 30, 2003, and the other composed of holders of Biosurgery Division stock on May 8, 2003, who subsequently sold their shares in the open market before June 30, 2003. (Compl. ¶¶ 35–36.) According to Genzyme, the nature of the sub-classes' claims differs, and each sub-class thus calls for different analysis under the Executive Protection Policy. Second, the plaintiffs in

Memo. of Law in Support of its Mot. to Dismiss 2 n. 1.)

the underlying class action brought claims against both Genzyme and its individual directors and officers. Genzyme argues that at least part of the settlement paid to the class members was indemnification for the claims asserted against the directors and officers. Genzyme thus argues that even if the class members' claims against it are not covered by the Executive Protection Policy, its indemnification of its directors and officers was covered by Insuring Clause 2.

To simplify matters, the Court will first consider whether Genzyme's expenses and settlement payment in connection with the claims asserted by the class members who participated in the Share Exchange constitute an insurable loss under Insuring Clause 3. The Court will then consider whether Genzyme may be covered with regard to the claims asserted against its directors and officers or by the shareholders who sold into the market before June 30, 2003.

## A. Genzyme's Settlement Payment Is Not an Insurable "Loss" for Purposes of Insuring Clause 3.

Federal first argues that the Settlement Payment is not an insurable "loss," either because it does not fall within the commonly accepted definition of the term "loss" or because the Settlement Payment is uninsurable as a matter of public policy. As explained above, the Executive Protection Policy defines the term "loss" as the "total amount which any Insured Person becomes legally obligated to pay on account of each Claim and for all Claims in each Policy Period ... made against them for Wrongful Acts for which coverage applies, including ... damages, judgments, settlements, costs, and Defense Costs." The

Policy explicitly states that the term "loss" does not include "matters uninsurable under the law pursuant to which this coverage section is construed."

■ Federal's argument that the term "loss," as used in the Executive Protection Policy, does not cover Genzyme's Settlement Payment is two-pronged. First, Federal argues that the Settlement Payment does not fall within the ordinarily understood meaning of the term "loss." Second, it contends that even if the Settlement Payment might fall within the commonly understood meaning of the word "loss," the Payment is uninsurable under Massachusetts law for reasons of public policy. However, in evaluating whether the Settlement Payment constitutes an insurable loss under the Executive Protection Policy, this Court will not attempt to make hairsplitting distinctions between the commonly understood meaning of the word "loss" and the requirements of public policy. Instead, the Court will use considerations of public policy to guide its inquiry into whether the Settlement Payment constitutes an insurable "loss," as that term is used in the Executive Protection Policy. *Cf. Level 3 Communications, Inc. v. Federal Ins. Co.*, 272 F.3d 908, 910 (7th Cir. 2001) (suggesting that issues of public policy and contract interpretation are "intertwined" since "an insurance policy wouldn't be presumed to have been drafted in such a way as to make it unenforceable").

■ In support of its argument that the Settlement Payment does not represent a "loss" for Genzyme, Federal cites a plethora of cases holding that an insured does not incur an insurable loss when she is merely forced to disgorge money or other property to which she is not entitled.[8] As

---

8. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Village of Franklin Park*, 523 F.3d 754, 756–57 (7th Cir.2008); *Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt.*, 369 F.3d 584, 591 (1st Cir.

the Seventh Circuit wrote in the leading case on this issue, "[A] 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain." *Level 3*, 272 F.3d at 910. This legal principle is undeniably correct and would almost certainly be adopted by a Massachusetts court. A thief should not be able to claim the return of stolen property as an insurable loss. Similarly, an individual who breaches her contract and then is forced to pay damages should not be able to seek indemnification under an insurance policy. If I pay only $100 for an item for which I promised to pay $200, and I am later ordered by a court to pay the additional $100, I should not be able to claim the additional $100 as an insurable loss. Had I paid the full $200 due up front, then clearly no part of the $200 would constitute loss covered by insurance. The dilatory nature of my obligatory payment should not transform it into an insurable event.

Genzyme attempts to distinguish the cases on which Federal relies by arguing that each of these cases relied on the principle that a *restitutionary* payment is uninsurable. Restitution, Genzyme argues, is a remedy for unjust enrichment. An individual has received a benefit to which she is not entitled—an "ill-gotten gain," in the words of *Level 3*—and she is forced to disgorge that benefit. But, Gen-

zyme contends, the case law on which Federal relies is inapposite when the insured party received no benefit to which it was not entitled. And in this case, Genzyme, the corporate entity, did not receive any benefit in the Share Exchange.

Genzyme is right that the cases on which Federal relies are at least potentially distinguishable from the case at bar. California courts have been particularly articulate in distinguishing between restitutionary payments, which generally are not insurable, and compensatory damages, which generally are insurable. A restitutionary remedy merely requires an individual "to return something he wrongfully received." Compensatory damages, on the other hand, seek to *compensate* a plaintiff for injury suffered as a result of the defendant's conduct, regardless of whether the defendant benefitted from his conduct or plaintiff's resulting injury in any way. *Jaffe v. Cranford Ins. Co.*, 168 Cal.App.3d 930, 935, 214 Cal.Rptr. 567 (1985).

Here, it is hard to see how Genzyme received any material benefit from the Share Exchange that could be disgorged by a restitutionary remedy.[9] It simply reorganized its capital structure by cancelling one series of stock and issuing additional shares of another series of stock. A corporation, as an entity, is neither benefitted nor harmed by issuing additional

2004); *Level 3 Communications, Inc. v. Federal Ins. Co.*, 272 F.3d 908, 910 (7th Cir.2001); *Alanco Techs., Inc. v. Carolina Cas. Ins. Co.*, No. CV04–789–PHX–DGC, 2006 WL 1371633, at *2–3 (D.Ariz. May 17, 2006); *Executive Risk Indem., Inc. v. Pac. Educ. Servs., Inc.*, 451 F.Supp.2d 1147, 1162 (D.Haw.2006); *Town of Brookhaven v. CNA Ins. Cos.*, No. CV–86–3569, 1988 WL 23555, at *3–4 (E.D.N.Y. Feb. 24, 1988); *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545, 553 (1992); *Local 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five Star Managers, L.L.C.*, 316 Ill.App.3d 391, 249 Ill.Dec. 75, 735 N.E.2d 679, 683

(2000); *Reliance Group Holdings, Inc. v. Nat'l Union Fire Ins. Co.*, 188 A.D.2d 47, 594 N.Y.S.2d 20, 24–25 (1993); *Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, 456 S.W.2d 489, 493–94 (Tex.Civ.App.1970).

9. As explained below, Genzyme did receive some consideration in exchange for its issuance of new General Division shares to Biosurgery Division shareholders: It gained the right to cancel the Biosurgery Division tracking stock. This intangible consideration, however, is not the type of ill-gotten gain that is susceptible to a restitutionary remedy.

shares of stock. A share of stock is a mere piece of paper. Issuing additional shares does not affect a corporation's assets or liabilities.

A corporation's shareholders, however, are hardly indifferent to the number of shares that a corporation issues. The more shares outstanding, the fewer corporate earnings attributable to each share, and the fewer distributions and dividends earned for each share of stock. Since issuing new shares has a "dilutive" effect on existing shareholders, current shareholders generally prefer for a corporation to minimize the number of new shares that it issues. To invoke a metaphor, it is not the baker who is harmed when his cake is cut into more and more pieces; instead, it is the cake eaters who are aggrieved by the prospect of receiving smaller slices. *See Enterasys Networks, Inc. v. Gulf Ins. Co.*, 364 F.Supp.2d 28, 31–32 (D.N.H.2005).

As a result, this case does not fit comfortably within the existing case law holding that the mere return of an ill-gotten gain is uninsurable. While Genzyme—as a corporate entity—received little or no gain from the Share Exchange, much less an ill-gotten one, its directors allegedly benefitted one class of shareholders—the holders of the General Division shares—at the expense of another class of shareholders— the holders of the Biosurgery Division shares. According to the plaintiffs in the underlying litigation, Genzyme was less a Butch Cassidy than a Robin Hood. Instead of "stealing" for its own benefit, it allegedly "stole" from the Biosurgery Division shareholders and "gave" to the General Division shareholders. The Settlement Payment then recalibrated the balance struck by Genzyme in the Share Exchange, effectively taking some money from the General Division shareholders and giving it to the Biosurgery Division shareholders to compensate for the original inequitable division.

To be sure, Federal attempts to force this case into the framework of the existing case law by arguing that Genzyme did benefit from the Share Exchange. According to Federal, this case is indistinguishable from *Level 3*. In *Level 3*, the insured allegedly acquired another corporation for less than its fair market value through fraudulent misrepresentations. Similarly, Federal argues, Genzyme plotted to acquire another corporation, Biomatrix, on the cheap through a somewhat complicated two-step process. First, Genzyme purchased Biomatrix by providing some cash upfront to Biomatrix shareholders and exchanging the Biosurgery Division tracking stock for the remaining Biomatrix shares. Then, Genzyme intentionally engaged in conduct that depressed the Biosurgery Division's share price, ultimately allowing Genzyme to fold the Biosurgery Division—and thus the remnants of Biomatrix—into the Genzyme General Division at an exchange ratio that did not represent Biosurgery's true value.

This allegation is interesting, but ultimately this Court cannot dismiss Genzyme's complaint based on Federal's gloss on the underlying litigation. In its complaint, Genzyme alleges that it received no material benefit in the Share Exchange (Compl. ¶ 52), and for purposes of ruling on Federal's motion to dismiss, the Court must accept the truth of this allegation. Rather than bending the standards for ruling on a motion under Federal Rule of Civil Procedure 12(b)(6) in order to shoehorn this case into the framework of existing case law, the Court prefers to analyze this case squarely as it is presented in Genzyme's complaint.

Even if the allegations in Genzyme's complaint are construed in the light most favorable to it, it is clear that the plaintiffs

in the underlying litigation at least alleged that Genzyme benefitted the General Division shareholders at the expense of the Biosurgery Division shareholders by exchanging an unfairly low number of General Division shares for Biosurgery Division shares, thus minimizing the dilutive effect of the Share Exchange on existing General Division shareholders. Fourth Am. Class Action Compl. ¶¶ 18–19, *Lewis v. Termeer*, No. 03–Civ–4014 (S.D.N.Y. Dec. 30, 2005). Genzyme may not have benefitted in the Share Exchange, but the existing General Division shareholders surely did. And the Settlement Payment was meant to redress that imbalance. The question then is: When a corporation pays a settlement to resolve a claim that it benefitted one group of shareholders at the expense of another group of shareholders, is this settlement payment an insurable loss? The answer to this question must undoubtedly be "no."

To understand why, it might be helpful to consider the following somewhat strained—but one hopes enlightening— hypothetical. Assume that a father has two sons. Let's call them Daniel and Eli. The father takes the sons to a local restaurant and orders a milkshake for the sons to split. Like all good milkshakes, part of the shake comes in an ordinary glass, and the remainder is served in the metal mixing cup in which the shake was prepared. The father takes the shake from the restaurant serving counter to the table and tells his sons, "I ordered a shake for you to share. Originally, I intended to give Daniel the glass and Eli the mixing cup, both of which contained roughly the same amount of liquid. However, since I saw that the shake in the different cups did not have the same consistency, I poured the cups' contents into a single plastic cup, stirred the shake, and then divided the

shake between you, giving Daniel two-thirds and Eli one-third." At this point, Eli naturally would complain, "Wait, that's unfair. Originally, I was supposed to get half of the total milkshake. Now I'll only get one-third. You're letting Daniel drink my milkshake!" [10] In response, one would expect the father to recognize his mistake and pour some milkshake from Daniel's cup into Eli's cup in order to equalize the distribution. One would not expect the father to turn to the restaurant owner and demand that he provide more milkshake to make up the difference.

However, that (essentially) is what Genzyme is doing. The Biosurgery Division shareholders in the underlying litigation complained that Genzyme had divvied up the benefits of holding an equity stake in Genzyme in an unfair way. In the Settlement Payment, Genzyme recalibrated the division it made in its Share Exchange by giving the Biosurgery Division shareholders money in place of the additional shares to which they claimed they were entitled in the Exchange. Genzyme should not be able to divide the benefits of equity ownership among its shareholders one way, redistribute those benefits, and then demand indemnification from its insurer for the redivision. If Genzyme's interpretation of the Settlement Payment as a "loss" were correct, one could imagine how insured companies could transform insurance policies into profit centers for their businesses. A corporation merely need issue several classes of shares, cancel one class of shares in an arguably unfair way, and then demand that its insurer pick up the tab for the resulting judgment or settlement. The shareholders whose shares were "cancelled" would be compensated through the judgment or settlement, and the corporation's other shareholders would obtain the

10. *Cf. There Will Be Blood* (Paramount Vantage & Miramax Films 2007) ("Daniel Plainview: Eli, you boy.... I drink your milkshake! I drink it up!").

benefits flowing from the share cancellation while shifting a portion of its costs to the corporation's insurer. Everyone would win, except for the insurance company forced to bear the loss of paying off the disgruntled shareholders. The Executive Protection Policy should not be read in a way that would produce such absurd results. *See State Police Ass'n v. Comm'r*, 125 F.3d 1, 4 (1st Cir.1997) ("The law . . . should be reluctant to insist that courts construe a document in a way that leads to an absurd or nonsensical result.").

## B. The Bump–Up Provision Bars Genzyme from Recovering from Federal under Insuring Clause 3.

The analysis above suggests that Genzyme's Settlement Payment does not constitute an insurable loss, either as a definitional matter or as a matter of public policy. The Court, however, need not rely on the above analysis alone. The Executive Protection Policy's Bump–Up provision expressly bars Genzyme from recovering from Federal for the Settlement Payment. The Bump–Up provision states that Federal "shall not be liable under Insuring Clause 3 for that part of Loss . . . which is based upon, arising from, or in consequence of the actual or proposed payment by any Insured Organization of allegedly inadequate . . . consideration in connection with its purchase of securities issued by any Insured Organization."

In response to Federal's claim that the Bump–Up provision requires dismissal of Genzyme's complaint, Genzyme argues that the Share Exchange did not involve a *purchase* of securities. Genzyme merely exchanged one class of stock for another; it did not "purchase" anything. Thus, the Bump–Up provision does not apply.

■ To resolve this dispute, the Court must determine the meaning of the word "purchase" as used in Insuring

Clause 3. In conducting this inquiry, the Court is guided by certain principles of contract interpretation applicable to insurance policies. First, absent evidence to the contrary, the Court presumes that words in the policy are used "in their usual and ordinary sense." *Hakim v. Mass. Insurers' Insolvency Fund*, 424 Mass. 275, 675 N.E.2d 1161, 1164 (1997). Second, since insurance policies are generally contracts of adhesion drafted by insurers, ambiguities generally should be resolved against the insurer and in favor of the insured. *Id.* at 1165. This rule of construction particularly applies to exclusionary provisions, such as the Bump–Up exclusion. Such exclusions from coverage must be "strictly construed," with any ambiguity in the exclusion construed against the insurer. *Id.* (quoting *Vappi & Co. v. Aetna Cas. & Sur. Co.*, 348 Mass. 427, 204 N.E.2d 273, 276 (1965)). In interpreting the policy, the Court must consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Id.* (quoting *Trustees of Tufts Univ. v. Commercial Union Ins. Co.*, 415 Mass. 844, 616 N.E.2d 68, 72 (1993)).

■ Obviously, these rules stack the deck in Genzyme's favor. Nevertheless, the Court concludes that the Share Exchange was a "purchase of securities" and thus was covered by the Bump–Up provision. One of the *Oxford English Dictionary's* definitions for the word "purchase" is "[t]he action or an act of obtaining something in exchange for payment in money or an equivalent"; this definition is followed by a note stating that this is "[n]ow the usual sense" in which the word is used. Oxford English Dictionary Online, http:// www.oed.com (last visited Sept. 24, 2009). Similarly, the *Random House Unabridged Dictionary* defines "purchase" as "acquisition by the payment of money or its equivalent; buying." *Random House Una-*

*bridged Dictionary* 1568–69 (2d ed.1993). Genzyme admits that it gave General Division shares, which as liquid securities are the equivalent of money, to Biosurgery Division shareholders in exchange for their relinquishment of their outstanding shares. But Genzyme argues that it did not "obtain" or "acquire" anything in return for the General Division shares that it issued. As explained above, the Court does not believe that Genzyme, as an entity, gained or benefitted from the Share Exchange in any material sense. However, through the Share Exchange, it did acquire an intangible right that it did not possess before— the right to cancel the outstanding Biosurgery Division tracking stock shares, which Genzyme wanted to do in order to reorganize its capital structure. It could not achieve this goal without first providing compensation, either in the form of cash or General Division shares, to the existing Biosurgery Division shareholders. In consideration for the Biosurgery Division shareholders' relinquishment of their shares, Genzyme issued them new shares in the General Division. The Share Exchange was unambiguously a "purchase" within the natural and ordinary meaning of the word. *Cf. Delta Fin. Corp. v. Westchester Surplus Lines Ins. Co. (In re Delta Fin. Corp.)*, 398 B.R. 382, 402 (Bankr. D.Del.2008) (holding that an exchange of securities may constitute a "purchase" within the meaning of a Bump–Up provision similar to the one at issue in this case).

The Court briefly notes that Genzyme's complaint seems to assume that the Share Exchange constituted a "purchase." Genzyme claims that Federal has breached Insuring Clause 3 of the Executive Protection Policy, which covers losses arising from "securities claims." As Genzyme's complaint notes (Compl. ¶ 11), the policy defines a "securities claim" as a claim that, "in whole or in part, is (a) based upon, arising from or in consequence of a Securities Transaction, or (b) brought by or on behalf of any securities holder of any Insured Organization." The next sentence of the complaint then states, "A 'Securities Transaction' is defined as 'the purchase or sale of, or offer to purchase or sell, any securities issued by any Insured Organization.'" (Compl. ¶ 11.) The complaint thus suggests that Genzyme believes that the Share Exchange falls within the insurance policy's definition of a "securities transaction." But if the Share Exchange was a "securities transaction," then it must have involved "the purchase ... of ... securities." Genzyme offers this Court no reason to believe that the word "purchase" was intended to mean one thing in the "securities transaction" definition but was intended to have an entirely different meaning in the Bump–Up provision.

Since the Share Exchange constituted a purchase of securities, the Bump–Up provision applies, and Genzyme is not entitled to payment from Federal under Insuring Clause 3.

## C. Genzyme Is Not Entitled to Reimbursement for its Purported Indemnification of its Officers and Directors.

█ Genzyme claims that even if it is not entitled to reimbursement under Insuring Clause 3 for the money it paid to settle the securities claims brought against it, it is entitled to reimbursement under Insuring Clause 2 for the money it allegedly paid to indemnify its officers and directors. Genzyme correctly notes that its settlement with the plaintiffs in the underlying class action resolved not only the claims that the plaintiffs brought against it as a corporate entity; the settlement also applied to the claims brought against Genzyme's individual officers and directors. Genzyme claims that the $64 million paid

to the class members included payments made to indemnify the officers and directors. Thus, Genzyme argues that it is entitled to at least some reimbursement from Federal under Insuring Clause 2, which obligates Federal to cover all loss for which Genzyme grants indemnification to its directors and officers.

Genzyme bolsters its claim by arguing that all of the reasons that Federal presents for escaping liability under Insuring Clause 3 do not apply to Insuring Clause 2. Even if the settlement payment did not represent a loss with respect to Genzyme, it certainly would have been a loss to Genzyme's officers and directors had they not been indemnified. The officers and directors, Genzyme argues, did not obtain any benefit from the Share Exchange; they were simply performing their duties as corporate agents.[11] Furthermore, the Bump–Up provision expressly states that it applies only to Insuring Clause 3; thus, it cannot bar Genzyme from seeking recovery under Insuring Clause 2 of the amount it paid to indemnify its officers and directors.

Although Genzyme's arguments have some superficial appeal, no case of which this Court is aware has split the baby in the way Genzyme suggests, barring coverage for claims against the corporate entity but holding the insurer liable for claims brought against individual directors and officers. As Federal argues in its reply memorandum, many of the leading cases holding that an insured does not incur an insurable "loss" when it makes a restitutionary settlement payment also involved lawsuits brought against both a company and its officers and directors. *See CNL*

*Hotels & Resorts, Inc. v. Twin City Fire Ins. Co.*, 291 Fed.Appx. 220 (11th Cir. 2008); *Executive Risk Indem., Inc. v. Pac. Educ. Servs.*, 451 F.Supp.2d 1147, 1150 (D.Haw.2006); *Enterasys Networks, Inc. v. Gulf Ins. Co.*, 364 F.Supp.2d 28 (D.N.H. 2005); *Reliance Group Holdings, Inc. v. Nat'l Union Fire Ins. Co.*, 188 A.D.2d 47, 594 N.Y.S.2d 20, 21–22 (1993). Nevertheless, each of these cases focused on the actual settlement payment made by the company, not on the company's indemnification of claims for which individual directors and officers might have been liable.

More importantly, it makes little sense to allow a corporation to sidestep coverage limitations in its insurance policy through the simple expedient of claiming that a settlement payment was made to indemnify its directors and officers. Since a corporation can only act through its corporate agents, it will often be the case that when a shareholder can bring a claim against the corporation, she can also bring one against its directors and officers. As the court concluded in the New York case of *Reliance Group Holdings, Inc. v. National Union Fire Insurance Co.*, 188 A.D.2d 47, 54, 594 N.Y.S.2d 20 (1993), the approach supported by Genzyme would encourage fraud by insured corporations:

> Under the construction urged by [the insured corporation and its officer], if an officer or director was sued together with the corporation, the corporation could make full or partial restitution of the embezzled or fraudulently obtained funds purportedly on behalf of its officer, adopt a resolution indemnifying the officer, and then successfully make claim

---

**11.** Actually, the individual defendants in the underlying litigation may have benefitted from the Share Exchange to the extent that they owned large numbers of General Division shares. *See* Fourth Am. Class Action

Compl. ¶ 20, Lewis, No. 03–Civ–4014. However, the Court does not base its ruling on any benefit that the directors and officers may have received through the Share Exchange.

against its D & O insurer for the full amount of the settlement.

The Court refuses to construe the Executive Protection Policy in a manner that would encourage such chicanery. If Genzyme cannot recover under Insuring Clause 3, it cannot try to save its case by relying on Insuring Clause 2.

### D. Genzyme Is Not Entitled to Reimbursement from Federal for That Part of the Settlement Payment That Went to the Sub-class Members Who Sold Their Shares into the Market Before June 30, 2003.

Genzyme has one more argument that it uses to try to wring at least some money out of Federal. The class action in the underlying litigation involved two sub-classes. The members of one sub-class sold their shares in the open market prior to June 30, 2003, and thus did not participate in the Share Exchange. Genzyme contends that it is entitled to reimbursement from Federal at least for the portion of the settlement payment that went to these class members. First, Genzyme argues that it could not have received an "ill-gotten gain" from these class members because it never engaged in a transaction with them; they sold their Biosurgery Division shares into the market rather than relinquishing them to Genzyme. Second, Genzyme contends that its settlement payment to these class members does not fall within the scope of the Bump–Up provision because it never in fact purchased securities from them.

Genzyme's arguments are not persuasive. When Genzyme announced the Share Exchange, it effectively put a cap on the value of the Biosurgery Division shares. For all intents and purposes, a Biosurgery Division share was worth 0.04914 shares of GENZ stock from the moment the Share Exchange was announced on May 8, 2003, even though the exchange was not scheduled to take place until almost two months later. Effectively, the loss—if any—was imposed on Biosurgery Division shareholders as soon as the board of directors' firm intention to follow through with the Share Exchange was announced. No rational investor would purchase a Biosurgery Division share on May 9, 2003, for more than 0.04914 the value of a GENZ share if he knew that the Biosurgery Division share would simply be converted into 0.04914 GENZ shares on June 30, 2003. When Biosurgery Division shareholders sold into the market rather than waiting for June 30 to arrive, they merely accelerated the realization of the losses that they claim were imposed upon them by Genzyme's directors. Thus, for purposes of the dispute between Federal and Genzyme, the claims of the sold-into-the-market sub-class are not relevantly different than the claims of the stuck-it-out sub-class.

Furthermore, the Bump–Up provision is capacious enough to cover the claims made by the members of both sub-classes. The Bump–Up provision applies to loss "arising from ... the actual *or proposed* payment ... of allegedly inadequate or excessive consideration in connection with [the] purchase of securities" (emphasis added). As explained above, the class members who sold their shares before June 30, 2003, claimed that they were damaged by Genzyme's mere announcement of the *proposed* Share Exchange. Since the Bump–Up provision applies to both actual and proposed payments of inadequate consideration for a corporation's own securities, it bars Genzyme from seeking reimbursement even for that part of the settlement payment that went to the class members who sold into the open market.

### E. Genzyme Has Not Stated a Claim under Mass. Gen. Laws Ch. 93a.

The above analysis demonstrates that Genzyme has not stated a claim against

Federal for breach of contract or for breach of the implied covenant of good faith and fair dealing.[12] That leaves only Genzyme's claim that Federal engaged in unfair and deceptive acts and practices in violation of Mass. Gen. Laws chs. 93A and 176D. But Genzyme effectively concedes that if Federal rightly denied coverage for the settlement payment, then it does not have a viable claim under these chapters of the Massachusetts General Laws. Pl.'s Opp'n to Def.'s Mot. to Dismiss 22; *see also Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 9–10 (1st Cir.2000); *Gulezian v. Lincoln Ins. Co.*, 399 Mass. 606, 506 N.E.2d 123, 127 (1987) ("An insurance company which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of [Mass. Gen. Laws ch. 93A]."); *Van Dyke v. St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 448 N.E.2d 357, 362 (1983); *Webb v. Metro. Prop. & Cas. Ins. Co.*, No. 9401644A, 1996 WL 1352749, at *3 (Mass.Super.Ct. Feb. 29, 1996). Thus, Genzyme's complaint must be dismissed in its entirety.

## VI. CONCLUSION

Genzyme allegedly benefitted one group of shareholders at the expense of another. It then made a settlement payment that partially recalibrated the balance struck by its Share Exchange. This recalibration does not constitute an insurable loss. Thus, Federal was correct to deny Genzyme's insurance claim, and Genzyme's

complaint based on this denial must be dismissed.

For the reasons set forth above, the Court **GRANTS** Federal's motion to dismiss Genzyme's complaint for failure to state a claim upon which relief can be granted (document # 12). Fed. R. Civ. Pro. 12(b)(6).

**SO ORDERED.**

12. Genzyme makes no attempt in its opposition to Federal's motion to dismiss to argue that its claim for breach of the implied covenant of good faith and fair dealing can survive the Court's holding that Genzyme has failed to state a claim for breach of contract. Thus, "[e]ven if there may be some circumstances in which a claimant who is pressing only nonmeritorious claims against an insurer may have some kind of remedy ... for breach of the implied covenant of good faith and fair dealing, [Genzyme] has failed to show that this is such a case." *Interex Corp. v. Atlantic Mut. Ins. Co.*, 874 F.Supp. 1406, 1420 (D.Mass.1995).