**FEDERAL DEPOSIT INSURANCE COR-PORATION as Receiver for the Bank For Savings, Plaintiff, Appellant,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant, Appellee/Third-Party Plaintiff, Appellant,**

v.

**Paul J. BONAIUTO and Dolores DiCologero, Third-Party Defendants, Appellees.**

Nos. 96–1556, 96–1557.

United States Court of Appeals, First Circuit.

Heard Nov. 4, 1996.

Decided Feb. 3, 1997.

Eugene J. Comey, with whom Robert D. Luskin, Comey Boyd & Luskin, Ann S. Du-Ross, Assistant General Counsel, F.D.I.C., Thomas L. Hindes, Counsel, E. Whitney Drake, Special Counsel, and Leslie Ann Conover, Senior Attorney, were on brief, Washington, D.C., for FDIC.

Gerald W. Motejunas, with whom Marie Cheung–Truslow and Lecomte, Emanuelson, Motejunas & Doyle were on brief, Quincy, MA, for Insurance Company of North America.

Before SELYA, Circuit Judge, CYR, Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

In 1977 the Massachusetts legislature enacted a statute, Mass.Gen.Laws ch. 175, § 112, which provided that, for certain types of liability insurance, the Commonwealth would adopt a "notice prejudice" rule. This new statutory rule departed from the traditional common law rule which had strictly enforced notice provisions in insurance policies, allowing forfeiture of coverage where notice to an insurer of a claim was late. The Supreme Judicial Court of Massachusetts subsequently extended, by common law, and then limited the extension of, the notice prejudice rule for liability insurance policies. At issue here is whether the notice due under a fidelity bond was late. If so, does the state common law notice prejudice rule, under which an insurer must show prejudice in order to be excused from coverage by the insured's late notice, extend to the Financial Institution Bond at issue.

The import here is whether a suit by the Federal Deposit Insurance Corporation ("FDIC"), as receiver for the failed Bank for Savings, may proceed against the Bank's insurer, the Insurance Company of North America ("INA"), for coverage of losses due to certain dishonest acts committed by a Bank officer and by a lawyer retained by the Bank. The loss to the Bank from these activities is asserted to be $10 million. The FDIC, as receiver for the Bank, seeks reimbursement for these losses to the full amount covered by the Financial Institution Bond issued by INA, $4 million.

## I.

The Bank gave INA notice of potential loss under the Bond on January 16, 1990. The insurer declined to pay, and the Bank brought suit. The district court, interpreting the Bond provisions on a motion for summary judgment, held that the Bank's notice was late because it had not been filed within 30 days of discovery of loss as required by the policy. *FDIC v. Insurance Co. of N. Am.*, 928 F.Supp. 54, 62–63 (D.Mass.1996). The court granted summary judgment for the defendant. *Id.* The Bank appeals, disputing the district court's analysis of the date of discovery and claiming that its notice was timely. The Bank further asserts that, even if its notice was late, the district court erred in failing to apply the notice prejudice rule to the Bond.[1]

Our review of a grant of summary judgment is *de novo. Wood v. Clemons,* 89 F.3d 922, 927 (1st Cir.1996). We hold that the district court was plainly correct in holding that the notice was late, but we do so on different grounds than the district court. We also hold that the notice prejudice rule does not apply in this instance.[2]

## II.

The facts of the employee misconduct underlying the Bank's losses are taken from the Bank's Bond claim and accepted as true for present purposes. From 1987 to 1989, Do-

1. The parties have agreed that Massachusetts law applies. The FDIC here sues as the receiver of a Massachusetts bank, and we discern no conflict between state law and federal statutory provisions or significant federal policies. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87–89, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994); *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966).

2. INA originally brought a third-party claim in this action against the dishonest Bank employees who caused the claimed losses. The district court dismissed INA's claim as moot because it held that, under the Bond, INA had no liability. INA appeals that dismissal. As we affirm the district court's finding that INA has no liability, INA's appeal on this issue is moot.

lores DiCologero, an Assistant Vice President of the Bank and the manager of the mortgage department, and Paul Bonaiuto, an attorney retained to represent the Bank in mortgage closings, conspired with a condominium development group, the Rostoff Group, to make hundreds of mortgage loans using inflated appraisals and purchase prices in violation of Bank regulations and the law.

The Bank made loans on condominium projects developed by the Rostoff Group until February 1989. Although internal regulations forbade the Bank from participating in more than one-third of the units in a particular development, the Bank exceeded these limits as to Rostoff Group properties. In addition, despite regulations prohibiting the financing of more than 80% of the purchase price of a property, the Bank made loans to purchasers for the full value of condominiums in Rostoff Group properties. Bonaiuto prepared closing documents overstating the purchase price of the condominiums and falsely indicating that the purchasers had equity in the property. The loan documentation reflected nonexistent down payments. In fact, the "down payments" took the form of discounts on the purchase price. DiCologero expedited approval of the mortgages without any investigation of the creditworthiness of the applicants, many of whom were not creditworthy for the loans given. The aggregate face value of the loans was approximately $30 million, and many culminated in default.

Other DiCologero family members also participated in the scheme, to their profit. The overstated values of the condominiums were supported by appraisals prepared by DiCologero's son. He earned more than $33,000 for his work; DiCologero's daughter received $4,550 from the Rostoff Group for secretarial work. DiCologero's husband received $12,000 in referral fees for directing potential purchasers to the Rostoff Group and purchased a condominium himself without paying a deposit, although the Bank records falsely reflected that he had done so. Other aspects of this tale of avarice and corruption need not be detailed. The Bank was declared insolvent on March 20, 1992, and the FDIC was appointed receiver. The FDIC asserts that these events helped bring down the Bank.

In March 1989, the Bank received a letter from counsel for Erna Hooton, a former bookkeeper of the Rostoff Group and a mortgagee on six Rostoff Group units. Ms. Hooton had defaulted on the loans, and the Bank had begun foreclosure proceedings. The letter said that the Bank had misrepresented in the loan documents that Ms. Hooton had made down payments on the properties. The letter also said that Ms. Hooton's financial position should have led the Bank to refuse financing. The letter claimed that Bonaiuto, as closing counsel on the Hooton loans, was aware of the false documentation. The Bank investigated these charges; representatives of the Bank met with Steven Rostoff, a principal of the Rostoff Group, on March 21, 1989. Rostoff said that the down payment for some loans, including Ms. Hooton's, had taken the form of a discounted purchase price. He denied that anyone associated with the Bank was aware of this. DiCologero also denied knowledge of any irregularities. The Bank responded to the Hooton letter by denying the allegations. Because Ms. Hooton did not pursue the matter, neither did the Bank.

Then, in August 1989, Herbert and Deanna Bello, two defaulting borrowers on six Rostoff Group units, sued the Bank for damages and asserted counterclaims in a foreclosure action brought by the Bank. The Bellos asserted, as had Ms. Hooton, that Bonaiuto was aware that they had not made the down payments reflected in the closing documents. They also alleged that when they told Steven Rostoff that they had previously been unable to obtain financing, he replied that they would "not have to worry about financing" because he had made a "deal" with the Bank. The Bank, the Bellos said, never asked for financial information from them. The Bellos further alleged that, at one closing, they had pointed out to Bonaiuto that the closing documents stated an inflated purchase price and an inflated down payment. Bonaiuto referred them to Rostoff, who said this was "what the Bank wanted." In the foreclosure action, the Bellos' counterclaim specifically

alleged that the Bank knowingly permitted Rostoff's misrepresentations.

Another couple who had purchased Rostoff Group properties, Edward and Dorothy Giamette, filed suit on September 22, 1989 against the Bank and the Rostoff principals. Again the complaint alleged that down payments were falsely represented on the closing documents, that Steven Rostoff told the plaintiffs that the Bank knew the figures were false, that the appraisals, which were done by DiCologero's son, were for more than the fair market value of the properties, and that this scheme had been repeated with at least eight other purchasers who had bought a total of forty-five condominiums. Earlier, on September 11, 1989, Mr. Giamette had made similar allegations in a counterclaim in the Bank's foreclosure action against him. None of these claims, however, prompted the Bank to notify INA of possible losses due to alleged employee misconduct. What eventually did lead the Bank to submit a notice of claim was a conversation in October 1989 between DiCologero and a Vice President of the Bank during which DiCologero remarked that her husband had purchased a condominium from the Rostoff Group without making a down payment. The Vice President reported DiCologero's remark to the Bank's President, who met with the Bank's Audit Committee on November 6, 1989. Outside legal counsel from Gaston & Snow were present at the meeting. The Committee discussed "the possibility of 100% loans, the unknown extent of these loans, employee involvement and legal ramifications." Gaston & Snow was asked to prepare a preliminary analysis which was submitted on November 15, 1989. Gaston & Snow then investigated and reported back to

the Bank on December 18, 1989. The report recommended, among other measures, that the Bank refer the matter to federal authorities, notify INA, and dismiss DiCologero. On December 27, 1989, the Bank filed a Report of Apparent Crime with the FDIC, advising that it had learned of suspected violations of federal law on December 18, 1989. The Bank also notified the FBI and the U.S. Attorney's Office. DiCologero, Bonaiuto, and the development group were later convicted on federal bank fraud and conspiracy charges. *United States v. Rostoff*, 53 F.3d 398 (1st Cir.1995).

On January 16, 1990, the Bank gave INA notice of a potential loss arising from employee misconduct. The Bank enclosed copies of the complaints in the Giamettes' state and federal lawsuits with its letter of notice.

### III.

As is customary in the banking industry, the Bank had obtained a Financial Institution Bond, Standard Form No. 24, from INA. The Bond period originally ran from January 1, 1988 to April 1, 1989, and was later extended by agreement to April 1, 1990. Insured losses include those resulting from employee dishonesty and fraud.[3] For present purposes, we assume that the actions of DiCologero and Bonaiuto caused the Bank to sustain losses of the type covered by the "INSURING AGREEMENTS FIDELITY" section of the Bond.[4]

The obligation of the insurer to indemnify the insured for covered losses is explicitly made:

> subject to the Declarations, Insuring Agreements, General Agreements, Condi-

---

**3.** Other types of losses covered under other portions of the Bond are not pertinent here.

**4.** That provision reads:

INSURING AGREEMENTS
FIDELITY

Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a) to cause the Insured to sustain such loss, and
(b) to obtain financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

tions and Limitations and other terms [of the Bond].

The "CONDITIONS AND LIMITATIONS" section of the Bond contains, among other clauses, the "DISCOVERY" clause. Under that clause, the Bond applies to "loss discovered by the Insured during the Bond Period." The clause then defines "Discovery" in two ways:

Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of the type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of the loss may not then be known.

Discovery also occurs when the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this bond.

The "CONDITIONS AND LIMITATIONS" section of the Bond also contains pertinent notice provisions which state in relevant part:

### NOTICE/PROOF—LEGAL PROCEEDINGS AGAINST UNDERWRITER

a) At the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give the Underwriter notice thereof.

Construing the Bond's first definition of discovery, the district court found that, at the latest, the Bank had discovered the loss by November 15, 1989. The court thus determined that the Bank was required to give notice to INA no later than December 15, 1989 and that the January 16, 1990 notice was therefore untimely. The district court concluded that, "[i]f notice to INA was untimely, the Bank is precluded from recovery, regardless of whether INA can prove any actual prejudice as a result of the delay. *J.I. Corp. v. Federal Ins. Co.*, 920 F.2d 118, 120 (1st Cir.1990) (interpreting *Johnson Controls v. Bowes,* 381 Mass. 278, 409 N.E.2d 185 (1980))." *Insurance Co. of N. Am.*, 928 F.Supp. at 59. The district court then granted INA's motion for summary judgment.

■ We agree that discovery was earlier than the Bank posits. Although the district court relied on the Bond's first definition of discovery to reach this conclusion, it is most clearly reached under the second definition. *See Levy v. FDIC,* 7 F.3d 1054, 1056 (1st Cir.1993). Under the second definition, discovery occurs "when the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this bond." The lawsuits and counterclaims brought by the Bellos and the Giamettes plainly constituted actual claims. The complaints alleged knowing acts of dishonesty or fraud by Bank employees.[5] Any harm caused by these alleged acts would qualify as loss under the Bond.[6]

The Bank weakly argues that these complaints "did not rise to the level of allegations of deceit and misrepresentation on the part of Bank employees seeking to obtain improper financial benefits but rather were nothing more than the litigation tactics of defaulting borrowers who were confronting foreclosure

---

5. We reject the Bank's argument that the complaints only alleged that the Bank itself defrauded the Bellos and Giamettes and thus could not constitute discovery of loss. The complaints and counterclaims all specifically allege that DiCologero and/or Bonaiuto acted in a dishonest and fraudulent manner under circumstances which, if true, would have created a loss under the Bond. Moreover, when the Bank finally provided INA with notice, it cited the allegations contained in the Giamette complaints as the source of its discovery of loss.

6. Though it is largely irrelevant for our purposes, we will assume that the other elements of "loss" are present—namely that, with regard to the portion of the loss resulting from loans, the employee(s), DiCologero and/or Bonaiuto, were in collusion with one or more parties to the transactions and received a financial benefit with a value of at least $2,500 from principals involved in the transactions. The Bank conceded in its notice letter to INA that, with regard to the loans alleged in the Giamette complaints, it appeared that DiCologero's family members received financial benefits of at least $2,500.

proceedings." That argument misses the point. The Bond requires notice to the insurer upon a claim of employee dishonesty and does not allow the insured to wait until the claim is proved. Further, General Agreement F of the Bond independently required the Bank to provide INA—within thirty days—with all pleadings and pertinent papers in any legal proceeding brought to determine the insured's liability for any loss.

The Bank also asserts that third-party claims do not trigger discovery under the second definition of discovery unless those claims are reasonable. Whether or not Massachusetts adopts such a reasonableness standard,[7] the claims here met any such requirement and triggered the notice requirement by, at the latest, mid-September 1989. By that time, the Bank had been informed that at least ten persons claimed to have purchased more than fifty condominiums from the Rostoff Group without any down payment or with a lower down payment than the Bank's loan documentation reflected. The Bank was charged with knowing that the figures in the loan documentation were false. The Bank's attorney was alleged to be complicit in the falsehoods. The son of the Bank's mortgage department manager purportedly had been paid for false appraisals. A principal of the Rostoff Group had confirmed that this had happened. The similarity of all the allegations is telling. If a "smell test" was in order, the smell was rank indeed. Accordingly, the notice given by the Bank on January 16, 1990 was untimely.

### IV.

More difficult is the question of whether the Massachusetts courts would apply the common law "notice prejudice" rule to Financial Institution Bonds of this sort. This is a question of law. *See J.I. Corp. v. Federal Ins. Co.*, 920 F.2d 118, 119 (1st Cir. 1990).

### A.

The two primary cases from the Supreme Judicial Court on the notice prejudice rule are *Johnson Controls, Inc. v. Bowes*, 381 Mass. 278, 409 N.E.2d 185 (1980), which creates a common law notice prejudice rule for liability policies, and *Chas. T. Main, Inc. v. Fireman's Fund Insurance Co.*, 406 Mass. 862, 551 N.E.2d 28 (1990), which limits the rule in the context of liability policies. The Massachusetts law of notice prejudice has been previously visited by the decisions of this court in *J.I. Corp., supra; National Union Fire Insurance Co. v. Talcott*, 931 F.2d 166 (1st Cir.1991); and *Liberty Mutual Insurance Company v. Gibbs*, 773 F.2d 15 (1st Cir.1985). For various reasons, in all three of these cases this court declined to apply the notice prejudice rule.

The Bank urges us to analyze the issue in terms of whether the admittedly different policy language in the Financial Institution Bond is closer to an "occurrence" liability policy or a "claims made and reported" liability insurance policy. There is, however, a logically prior question and one which it is prudent to ask under our obligation to apply state substantive law (in the absence here of any conflict with or a threat to federal policies). *See Atherton v. FDIC*, — U.S. —, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also infra* n. 1. We must apply the law of Massachusetts as given by its state legislature and state court decisions. And in that lies the difficulty of the Bank's position.

The Supreme Judicial Court has never applied the notice prejudice rule to a Financial Institution Bond. Such fidelity bonds, as discussed later, are different in kind from liability insurance policies. In creating a common law notice prejudice rule, the *Johnson Controls* court did so in the context of liability policies. The statutory progenitor to *Johnson Controls* concerned automobile liability

---

**7.** *But cf.* Clore & Keeley, "Discovery of Loss," in *Financial Institution Bonds* 89, 113 (Duncan L. Clore ed., 1995) ("As long as a third party's claim would constitute a covered loss under the bond if proven to be true, it matters not whether the allegations are perceived as true. Instead, the allegations can be completely false. The point is, once the allegations are made, the insurer has the right to know about them and to conduct whatever investigation it may deem appropriate.").

policies.[8] The refinement and limitation of the notice prejudice rule in *Chas. T. Main* was also in the context of liability policies. And the usual posture in which the court has applied the rule has been in liability policies. *See, e.g., Darcy v. Hartford Ins. Co.,* 407 Mass. 481, 554 N.E.2d 28 (1990). No court has yet extended the Massachusetts notice prejudice rule to fidelity policies such as this Bond. *See, e.g., J.I. Corp.,* 920 F.2d at 118; *Boston Mut. Life Ins. Co. v. Fireman's Fund Ins. Co.,* 613 F.Supp. 1090 (D.Mass.1985).

When guidance is sought from Massachusetts caselaw concerning fidelity policies, that law, admittedly not of recent vintage, does not require our application of the notice prejudice rule here. The background law of Massachusetts, which we believe is not overruled by *Johnson Controls,* was that conditions and limitations in such policies are construed as written.[9] In *Gilmour v. Standard Surety and Casualty Co.,* 292 Mass. 205, 197 N.E. 673 (1935), the court was concerned with a bond for acts of dishonesty. "The contract of suretyship made by the defendant provided indemnity to the plaintiffs in the event they sustained loss through dishonest conduct on the part of the agency." *Id.* 197 N.E. at 673. The bond had the following condition and limitation: "That loss be discovered during the continuance of the suretyship or within six (6) months after its termination, and notice delivered to the Surety at its Home Office within ten (10) days after such discovery." *Id.* at 673. The court held that "[t]he giving of such notice was made a condition precedent to recovery on the bond." *Id.* at 675. The court noted that it was concerned not with "the question of the circumstances under which at common law

an obligation is imposed on the obligee in a fidelity bond to give the surety notice," but rather with the question of the timing of the notice given. *Id.* at 674. The question was whether the plaintiffs had complied with the ten day notice period in order to be able to recover on the bond. The notice was apparently given during the bond year, but the court still considered the dispositive question to be whether the notice was given within the ten day period. *Id.* at 674. (The court concluded that it had). No case has said that *Gilmour* has been overruled.

In *Liberty Mutual Insurance Co. v. Gibbs,* 773 F.2d 15 (1st Cir.1985), this court held that, *Johnson Controls* notwithstanding, the contract of insurance there must be enforced according to its terms and that the notice prejudice rule did not apply. At issue was a contract of reinsurance. The contract's notice clause required notice to be given "as soon as possible." *Id.* at 18. Our court thought important three things. First, the parties involved were not lay policyholders who required protection. *Id.* Second, the case involved two insurance companies, experienced businesses, that had bargained at arm's length. *Id.* Third, the Massachusetts insurance statute, as is true here,[10] distinguished between the contracts at issue (reinsurance) and liability policies. *Id.*

In *Cheschi v. Boston Edison Co.,* 39 Mass. App.Ct. 133, 654 N.E.2d 48, 53 (1995), Chief Judge Warner of the Appeals Court of Massachusetts rejected application of the notice prejudice rule to an indemnity contract, distinguishing *Johnson Controls.* The court adopted and expanded upon this court's reasoning in *Liberty Mutual,* doubting that the notice prejudice rule would apply to types of

---

**8.** In *Goodman v. American Casualty Co.,* 419 Mass. 138, 643 N.E.2d 432, 434 (1994), the court applied the usual notice prejudice rule for automobile liability coverage to uninsured motorist coverage, finding no meaningful distinction between the two. *Accord MacInnis v. Aetna Life and Cas. Co.,* 403 Mass. 220, 526 N.E.2d 1255 (1988).

**9.** The requirement of timely notice is a condition of this Bond and so is a condition of coverage under the parties' agreement. In a bond of this type, the Insured agrees to comply with the bond's "CONDITIONS AND LIMITATIONS" governing the procedure for presenting and

proving the Insured's claim in exchange for the indemnity promised by the Underwriter. Woods, "Conditions Precedent to Recovery: Presentation of the Insured's Claim," *in Financial Institution Bonds* 285, 285 (Duncan L. Clore ed., 1995). "A condition, unlike an agreement or a covenant, makes the Bond's indemnity *contingent upon the Insured's performance of the condition.*" *Id.* (emphasis added).

**10.** *See* Mass.Gen.Laws ch. 175, § 107 (distinguishing between surety bonds and insurance contracts).

insurance other than liability insurance when the insureds were not laypersons and when the parties to the contract were two sophisticated business concerns. 654 N.E.2d at 53. The court held that it would apply traditional contract principles to the language of the indemnity clause, saying: "Rules addressing the special circumstances of certain insurance policies should not be applied in these circumstances." *Id.* at 53–54. Because it found language in the policy equivalent to making prompt notice a condition, the court held that the lack of prompt notice relieved the insurer of its obligation to reimburse the insured. *Id.* at 54.

Guided by these principles, we analyze Massachusetts law. *Cheschi* cautions against automatic application of notice prejudice rules designed for one type of insurance to other insuring arrangements.[11] 654 N.E.2d at 53–54. The Bond here is a Financial Institution Bond, Standard Form No. 24, as revised in 1986. It is the most recent form in a long line of Financial Institution Bond forms utilized by members of the Surety Association of America. *See generally* Knoll & Bolduan, "A Brief History of the Financial Institution Bond," *in Financial Institution Bonds* (1995), *supra*, at 1. Such bonds are basically fidelity bonds, written specifically for financial institutions, including commercial and savings banks, savings and loan associations, credit unions, stockbrokers, finance companies, and insurance companies. I Fitzgerald et al., *Principles of Suretyship* 67 (1st ed. 1991).

Fidelity bonds are a sort of "honesty insurance," insuring against employee dishonesty. *See* Weldy, "History of the Bankers Blanket Bond and the Financial Institution Bond with Comments on the Drafting Process," *in Financial Institution Bonds* 1, 1 (1989); Knoll & Bolduan, *supra*, at 1. The capacity of one who ensures the fidelity of another's employee has been described as part insurer and part surety, with liability in either capacity being primary and direct. 1 Russ & Segalla, *Couch on Insurance 3d* § 1:16 (1995). Early Massachusetts cases about the Blanket Bankers Bond, the predecessor to the Financial Insurance Bond, use both the language of surety and the language of insurance. *See, e.g., Fitchburg Sav. Bank v. Massachusetts Bonding & Ins. Co.*, 274 Mass. 135, 174 N.E. 324, 328 (1931).

It is said that "[i]n most cases and for most purposes, . . . [fidelity bonds] are recognized to be a form of insurance that are subject to the rules applicable to insurance contracts generally." 1 *Couch on Insurance 3d, supra*, § 1:16 (citing law from various states). Nonetheless, scholars have noted that, while fidelity bonds have, over time, become more like insurance contracts,[12] a fidelity bond is still not liability insurance:

> Although often referred to as insurance, it is not liability insurance, but rather a two-party indemnity agreement through which the insurer reimburses the insured for losses actually suffered in accordance with the contract provisions.

Weldy, *supra*, at 2; *see also* Knoll & Bolduan, *supra*, at 5.

It is significant that the Bond possesses some characteristics of surety arrangements which distinguish them from liability policies. "The nature of the risk assumed by the party in the role of 'insurer' is a major distinction between insurance and the arrangements of guaranty and surety. . . . [T]he risk can be characterized in terms of the degree to which the contingency is within the control of one of the parties. In the classic instance

---

**11.** In *J.I. Corp.*, this court, based on the analysis of the language in a fidelity policy, declined to apply the notice prejudice rule to that policy. While *dicta* in *J.I. Corp.* suggests that the operative distinction is not the type of insuring arrangement involved, 920 F.2d at 120, the panel did not have the benefit of *Cheschi*.

**12.** The transformation from treatment as a surety bond to treatment as an insurance contract was prompted by a broadening in the scope of coverage of fidelity bonds. "[F]idelity coverage came to encompass not only traditional employee dishonesty, but other related risks, and became more like a contract of insurance, using the terms 'underwriter' and 'insured' instead of 'surety' and 'obligee.'" Knoll & Bolduan, *supra*, at 5. Here, the only insuring clause at issue is the one covering "traditional employee dishonesty." But it is also true that INA is described in the Bond as an "underwriter" providing insurance.

of insurance, the risk is controlled only by chance or nature. In guaranty and surety arrangements, the risk tends to be wholly or partially in the control of one of the three parties [promisor, creditor, or debtor]." 1 *Couch on Insurance 3d, supra,* § 1:18. There is also a difference in the liability of a classic insurer and that of surety/guarantor. An insurer, upon the occurrence of the contingency, must bear the ultimate loss, while a surety is entitled to indemnity in case the surety is compelled to perform.

■ It is also significant, as was true in *Liberty Mutual,* 773 F.2d at 18, that the Massachusetts legislature has made distinctions in this area. The Massachusetts legislature has decided that, for most regulatory purposes, surety bonds are not insurance contracts. *See* Mass. Gen. Laws ch. 175, § 107. In *Williams v. Ashland Engineering Co.,* 45 F.3d 588, 592 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995), this court found that "surety bonds are not insurance contracts, and are thus not subject to the Commonwealth's insurance laws." *See also General Elec. Co. v. Lexington Contracting Corp.,* 363 Mass. 122, 292 N.E.2d 874, 876 (1973). That expression of public policy undercuts any automatic application of the insurance notice prejudice rule to surety bonds, and thus to Financial Institution Bonds to the extent that they partake of the characteristics of surety bonds.

■ These distinctions confirm our reluctance to extend the state notice prejudice rule for liability insurance to Financial Institution Bonds. The material technical and substantive differences between a Financial Institution Bond and liability insurance make it difficult to apply easily the common law notice prejudice rule, developed as it was in the liability insurance context, to the insuring arrangement here.

In *Cheschi,* as in *Liberty Mutual,* the court considered the fact that the insuring arrangements (not liability policies) did not involve layperson consumers. Rather, they involved sophisticated businesses. Accordingly, there was little reason to depart from the usual rule of holding the parties to their

bargain. In *Johnson Controls,* the Supreme Judicial Court had stated that one reason for applying the notice prejudice rule in that case was that the insurance policy was:

> not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured. The only aspect of the contract over which the insured can 'bargain' is the monetary amount of the coverage.

409 N.E.2d at 187 (quoting *Brakeman v. Potomac Ins. Co.,* 472 Pa. 66, 371 A.2d 193, 196 (1977)).

Here, in contrast, the Bond is an agreement whose basic terms are negotiated between two industries. Over the years, the banking industry and the fidelity bond companies have negotiated various standard forms of the Financial Institution Bonds. *See generally* Knoll & Bolduan, *supra;* Weldy, *supra.* As one commentator has noted, "the fidelity bond is an arms-length, negotiated contract between sophisticated business entities, the standard form for which was drafted by the joint efforts of the Surety Association of America and the American Bankers Association." Koch, *supra,* at vii. For example, at the request of the American Bankers Association, the 1986 Bond added coverage for Uncertificated Securities, and adopted the UCC definitions of these financial instruments. Knoll & Bolduan, *supra,* at 25; *see also Calcasieu–Marine Nat'l Bank v. American Employers' Ins. Co.,* 533 F.2d 290, 295 n. 6 (5th Cir.) (bankers bond being construed was drafted as a joint effort by the American Bankers Association and the American Surety Association), *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).

■ The Bank brings up the doctrine of *contra proferentem* arguing that "[a]mbiguities are resolved against the insurer, who drafted the policy, and in favor of the insured." *GRE Ins. Group v. Metropolitan Boston Hous. Partnership, Inc.,* 61 F.3d 79, 81 (1st Cir.1995). This doctrine provides the Bank no refuge. The presumption against the insurer is not applied where the policy language results from the bargaining between sophisticated commercial parties of

similar bargaining power. *Falmouth Nat'l Bank v. Ticor Title Ins. Co.,* 920 F.2d 1058, 1062 (1st Cir.1990)(applying Massachusetts law).[13]

Thus, to the extent the notice prejudice rule is supported by the policy of protecting consumers who effectively have little or no bargaining leverage, that policy provides no basis here to extend the notice prejudice rule.

### B.

Finally, the Bank draws support for its position from a Tenth Circuit decision, *FDIC v. Oldenburg,* 34 F.3d 1529 (10th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 171, 133 L.Ed.2d 112 (1995) and district court decisions from other jurisdictions. The court in *Oldenburg* predicted that Utah law would require a Financial Institution Bond company to show prejudice in order to avoid coverage where the bank gave late notice. *Id.* at 1546. The court held that the notice prejudice rule applied in light of: (1) the failure of the policy to expressly make notice within a specific time a condition precedent to recovery; (2) the Utah rule that provisions excluding coverage are strictly construed against the insurer; and (3) a Utah statute, enacted after the Bond period, which expressed a public policy that the notice prejudice rule be applied to all insurance policies. *Id.* at 1545–46. Whatever the requirements of Utah or other law, Massachusetts law governs this issue, and Massachusetts has, until the Supreme Judicial Court or the state legislature decides otherwise, framed its public policy choices differently.

We hold that the notice prejudice rule does not apply.

*Affirmed.*

---

**13.** The Fifth Circuit has also rejected the application of the doctrine of *contra proferentem* to Financial Institution Bonds. *Sharp v. FSLIC,* 858 F.2d 1042, 1046 (5th Cir.1988); *Calcasieu–Marine Natl Bank,* 533 F.2d at 295 n. 6.