# United States Court of Appeals
## For the First Circuit

No. 09-2485

GENZYME CORPORATION,

Plaintiff-Appellant,

v.

FEDERAL INSURANCE COMPANY,

Defendant-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Boudin, Dyk,* and Thompson, Circuit Judges.

Robert G. Jones and John D. Donovan, Jr., with whom Peter L. Welsh, Katherine A.K. Mumma, Elizabeth E. Feeherry, and Ropes & Gray LLP were on brief for appellant.
Daniel J. Standish, with whom Marc E. Rinder, Howard Anglin, and Wiley Rein LLP were on brief for appellee.

October 13, 2010

---

*Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**. Genzyme Corporation ("Genzyme") appeals from a district court order dismissing Genzyme's complaint against Federal Insurance Company ("Federal") for failure to state a claim. Genzyme sought to recover its costs in settling a shareholder class action under a corporate and director and officer liability insurance policy ("the policy") issued to Genzyme by Federal. Federal denied coverage and Genzyme sued, seeking damages of $10 million plus other relief. The district court held that Genzyme's loss was not insurable as a matter of Massachusetts public policy. We disagree with this conclusion. In the alternative, the district court held that Genzyme was precluded from recovering under the terms of the policy's so-called "Bump-Up" clause for any amount paid to settle claims. We agree with the district court that the policy does not cover the amount paid to settle claims against the corporation. However, we hold that the policy does cover any settlement amounts paid pursuant to an indemnification obligation with respect to the directors and officers. Because a portion of the settlement amount may have been paid to settle claims against the directors and officers, we remand to the district court to consider the question of allocation.

## I.

## A.

Genzyme is a biotechnology corporation organized under the laws of the Commonwealth of Massachusetts. From 1994 to 2003,

-2-

Genzyme's capital structure included "tracking stock" designed to track the performance of particular business divisions rather than the company as a whole. From December 2000 through June 2003, three series of Genzyme tracking stock were outstanding, one each for the General Division (which traded under the ticker symbol GENZ), the Biosurgery Division (which traded as GZBX), and the Molecular Oncology Division (which traded as GZMO). Each of these tracking stocks was a series of Genzyme's common stock. Genzyme allocated the performance of programs, assets, and liabilities to each division. However Genzyme owned the divisional assets and was responsible for all liabilities. Therefore, though the tracking stocks reflected the financial performance of the separate divisions, the divisions themselves were not separate entities. Each division was owned directly by Genzyme and holders of the tracking stock were holders of a single class of Genzyme's stock and possessed voting rights in Genzyme as a whole. Each of these tracking stocks was registered under the Securities Exchange Act of 1934 and traded under its own symbol on the NASDAQ Exchange.

Genzyme's Articles of Organization ("Articles") contained an optional share exchange provision which permitted Genzyme to eliminate its tracking stock structure by requiring Biosurgery Division and Molecular Oncology Division shareholders to exchange their shares either for General Division shares or for cash.[1]

---

[1] The share exchange provision provided as follows:

The Articles specified that each division shareholder would receive shares of General Division stock equal to 130% of the "fair market value" of the tracking stock in any share exchange. The Articles defined "fair market value" as the average closing price of GZBX or GZMO stock during a twenty-day period commencing thirty days prior to the announcement of a share exchange.

On May 8, 2003, Genzyme announced that it had decided to invoke the exchange provisions in the Articles and thereby eliminate the tracking stocks. We refer to this as the "share exchange." In particular, Genzyme announced that it would exchange each Biosurgery Division and Molecular Oncology Division share for a certain number of General Division shares, leaving the General

The Board of Directors may at any time . . . in one transaction or a series of related transactions, by [Genzyme] and/or its subsidiaries of all or substantially all the properties and assets allocated to Genzyme Biosurgery Division to any other Division of Genzyme (A "GBS Reallocation"), declare that each of the outstanding shares of GBS stock shall be exchanged, on an Exchange Date, as determined by the Board of Directors, for (a) a number of fully paid and nonassessable shares of [Genzyme General Division] stock . . . equal to (1) 130% of the Fair Market Value of one share of the GBS stock (the "GBS Optional Exchange Amount") as of the date of the first public announcement by [Genzyme] (the "GBS Optional Exchange Announcement Date') of such exchange divided by (2) the Fair Market Value of one share of [Genzyme General Division] stock as of such GBS Optional Exchange Announcement Date or (b) cash equal to the GBS Optional Exchange Amount, or (c) any combination of [Genzyme General Division] Stock and cash equal to the GBS Optional Exchange Amount as determined by the Board of Directors.

J.A. 96.

-4-

Division shares as the only outstanding common stock of the corporation. The share exchange was carried out on June 30, 2003. Each Biosurgery Division shareholder received 0.04914 shares of GENZ stock per share of GZBX stock. Genzyme itself received nothing in the exchange, other than cancellation of the tracking stock.

The share exchange was unpopular with many Biosurgery Division Shareholders and soon after it was announced, a number of shareholder lawsuits were filed against Genzyme, its board of directors, and its officers. One of these cases was filed in the United States District Court for the Southern District of New York against Genzyme, its directors, and two of its officers. That court certified a class consisting of those persons who held shares of GZBX stock when, after the market closed on May 8, 2003, Genzyme announced the share exchange. On August 6, 2007, Genzyme agreed to settle all of the class members' claims against the company and against its directors and officers by making a one-time payment of $64 million. The entirety of the settlement payment was paid by Genzyme. Genzyme now seeks to recover from Federal for the settlement payment in the amount of $10 million, the maximum recovery allowed under the policy. Although at least some of Genzyme's theories might also allow it to recover litigation costs in the shareholder suit, Genzyme does not seek to recover those

costs, presumably because the settlement costs ($64 million) exceed the $10 million policy cap.

## B.

An understanding of the claims made by the plaintiffs in the class action is integral to an understanding of the dispute between Genzyme and Federal. The operative complaint at the time of settlement, the Fourth Amended Class Action Complaint, alleged that the creation of Genzyme's Biosurgery Division tracking stock was a product of its merger with Biomatrix, Inc. ("Biomatrix"), an independent biomaterials company. This merger combined the assets of Biomatrix with those of Genzyme's Surgical Product Division and Tissue Repair Division to create the Biosurgery Division.

The class action plaintiffs alleged that Genzyme promised at the time of the merger that it would operate Biosurgery as an independent business reflected by tracking stock, but failed to do so. In addition, the class action plaintiffs alleged that Genzyme's directors and officers managed the Biosurgery Division's corporate earnings and withheld positive information about the Biosurgery Division in an effort to artificially depress the market value of the GZBX stock so that Genzyme could fold the Biosurgery Division into the General Division at an exchange rate that would be favorable to General Division shareholders. Since the Articles provided a fixed ratio of exchange which depended on the market value of the Biosurgery Division shares, Genzyme could execute the

-6-

share exchange with fewer General Division Shares by artificially depressing the market value of the Biosurgery Division shares. General Division shareholders would benefit from an exchange executed by issuing the minimum number of new General Division shares possible.

The class action plaintiffs alleged that Genzyme and its officers and directors violated the securities laws by causing Genzyme to engage in insider trading and by failing to disclose material information to the public. They also alleged that the directors and officers breached their fiduciary duties of loyalty, candor, good faith, and due care to Genzyme shareholders, including the Biosurgery Division shareholders. The class action plaintiffs further alleged that Genzyme breached the implied covenant of good faith with respect to the Articles of Organization and that Genzyme breached the merger agreement it had executed with Biomatrix. Finally, the class action plaintiffs alleged that Genzyme engaged in unfair and deceptive trade practices under state law. The class action plaintiffs alleged that the directors and officers would be motivated to carry out such a scheme by virtue of the fact that they themselves owned large numbers of General Division shares.

The class action in the underlying litigation involved two sub-classes. The members of one sub-class sold their shares in the open market after the share exchange was announced but before June 30, 2003, when the share exchange occurred, and thus did not

participate directly in the share exchange.  The members of the other sub-class transferred their shares pursuant to the share exchange.

## C.

On September 22, 2002, Federal issued the director and officer and corporate liability insurance policy at issue to Genzyme.  The policy covers claims made during the period of September 22, 2002, to September 22, 2003, the period during which the class action plaintiffs' complaints were filed.  It limits Federal's liability to $10 million and is subject to a $15 million deductible under Insuring Clause 2.  Insuring Clause 2 covers losses for which Genzyme grants indemnification to its directors and officers.  Insuring Clause 3 covers losses suffered by Genzyme on account of securities claims.  Insuring Clause 2 provides:

> [Federal] shall pay on behalf of [Genzyme] all Loss for which [Genzyme] grants Indemnification to each Insured Person [i.e., Genzyme's officers and directors], as permitted or required by law, which the Insured Person has become legally obligated to pay on account of any Claim first made against him, individually or otherwise, during the Policy Period . . . for a Wrongful Act committed, attempted, or allegedly committed or attempted by such Insured Person before or during the Policy Period.

J.A. 179.  Insuring Clause 3 provides:

> [Federal] shall pay on behalf of [Genzyme] all Loss for which it becomes legally obligated to pay on account of any Securities Claim first made against it during the Policy Period . . . for a Wrongful Act.

J.A. 69. The policy defines "Loss" as the "total amount which [Genzyme or its officers and directors] become[] legally obligated to pay on account of each Claim and for all Claims in each Policy Period . . . made against them for Wrongful Acts for which coverage applies, including, but not limited to damages, judgments, settlements, costs and Defense Costs." J.A. 51 (emphasis added). The policy also provides that "Loss" does not include "matters uninsurable under the law pursuant to which [the policy] is construed." Id.

The policy also contains a "Bump-Up"[2] provision which provides that:

> [Federal] shall not be liable under Insuring Clause 3 for that part of Loss, other than Defense Costs, which is based upon, arising from, or in consequence of the actual or proposed payment by any Insured Organization of allegedly inadequate or excessive consideration in connection with its purchase of securities issued by [Genzyme].

J.A. 71 (emphases added). By its terms, the Bump-Up exclusion only applies to claims made against Genzyme that implicate Insuring Clause 3. The policy does not define the term "purchase of securities."

The policy also contains an "Allocation" provision which provides as follows:

> If a Securities Claim covered, in whole or in part, under Insuring Clauses 2 or 3 results in any [director or

---

2    Federal explains that the term "Bump-Up" is used in the insurance industry to describe litigation seeking to increase or "bump-up" the consideration paid for a security.

-9-

officer] under Insuring Clause 2 or [Genzyme] under Insuring Clause 3 incurring both Loss covered hereunder and loss not covered hereunder, because such Securities Claim includes both covered and uncovered matters, [the parties] shall allocate such amount to Loss as follows:

1. 100% of such amount constituting Defense Costs shall be allocated to covered Loss; and
(ii) 100% of such amount other than Defense Costs shall be allocated to covered Loss.
(iii) Notwithstanding [(i) and (ii)], [the parties] shall allocate that part of Loss subject to [certain exclusions, including the Bump-Up clause] based upon the relative legal exposure of the [directors and officers and Genzyme].

J.A. 71.

### D.

Genzyme sought indemnification from Federal under the policy. Federal denied coverage, stating that the settlement payment is not an insurable loss under the policy. Genzyme filed suit against Federal in the Massachusetts state courts, and the case was removed to the United States District Court for the District of Massachusetts. Genzyme alleged (1) that Federal breached its contract with Genzyme by denying coverage; (2) that Federal breached the implied covenant of good faith and fair dealing; and (3) that Federal engaged in unfair and deceptive acts and practices, in violation of Mass. Gen. Laws chs. 93A and 176D.

Federal moved to dismiss Genzyme's complaint under Federal Rule of Civil Procedure 12(b)(6) on the grounds that it failed to state a claim upon which relief can be granted. On September 28, 2009, the district court dismissed the suit. <u>Genzyme</u>

Corp. v. Federal Ins. Co., 657 F. Supp. 2d 282 (D. Mass. 2009). The district court found that the settlement payment was not an insurable loss for the purposes of Insuring Clause 3 as a matter of public policy. In reaching this conclusion, the district court opined that Genzyme, in effect, "stole" from the Biosurgery Division shareholders and conferred an improper benefit on the General Division shareholders. Id. at 290.

The district court reasoned that "Genzyme should not be able to divide the benefits of equity ownership among its shareholders one way, redistribute those benefits, and then demand indemnification from its insurer for the redivision." Id. at 291. The district court expressed its concern that a company could take advantage of a legal rule permitting indemnification in such circumstances, with the result being that "the shareholders whose shares were 'cancelled' would be compensated through the judgment or settlement, and the corporation's other shareholders would obtain the benefits flowing from the share cancellation while shifting a portion of its [sic] costs to the corporation's insurer." Id. at 291-92. The district court therefore concluded that the settlement payment was not an insurable loss as a matter of Massachusetts law, holding that a payment "to resolve a claim that [a corporation] benefitted one group of shareholders at the expense of another group of shareholders" is not legally insurable as against public policy. Id. at 291.

-11-

In the alternative, the district court held that the settlement payment represented a loss in connection with Genzyme's "purchase" or "proposed" purchase of its own securities, thereby triggering the Bump-Up exclusion and excluding the payment from coverage under Insuring Clause 3. The district court also held that under the Bump-Up clause, Genzyme was not entitled to reimbursement for its indemnification of its officers and directors under Insuring Clause 2 even if the Bump-Up clause did not apply on its face to Insuring Clause 2. Noting that "it will often be the case that when a shareholder can bring a claim against the corporation, she can also bring one against its directors and officers," the district court opined that permitting Genzyme to recover "would encourage fraud by insured corporations." Id. at 294. The district court therefore concluded that "it makes little sense to allow a corporation to sidestep coverage limitations in its insurance policy through the simple expedient of claiming that a settlement payment was made to indemnify its directors and officers." Id. Finally, the district court held that Genzyme did not state a claim of unfair and deceptive acts and practices under Mass. Gen. Laws ch. 93a.

Genzyme timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

**II.**

This court reviews a district court's decision to dismiss a complaint for failure to state a claim de novo. Vernet v. Serrano-Torres, 566 F.3d 254, 258 (1st Cir. 2009). "[W]e, like the district court, must assume the truth of all well-plead facts and give the plaintiff[s] the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007). In this respect, to survive a motion to dismiss, a complaint must establish "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). Under Massachusetts law, "[c]onstruction of insurance contracts and application of their terms [to those facts alleged] are matters of law" subject to de novo review. Preferred Mut. Ins. Co. v. Travelers Cos., 127 F.3d 136, 137 (1st Cir. 1997).

**III.**

The policy's definition of "Loss" excludes "matters uninsurable under the law pursuant to which [the policy] is construed." J.A. 51. The district court held that the settlement payment is not an insurable loss for any of the insuring clauses, including Insuring Clause 3, as a matter of Massachusetts public policy because the settled claims charged that Genzyme benefitted one group of shareholders at the expense of another. The district court provided no case or statutory support for this holding.

-13-

Massachusetts law governs the scope of the policy. The public policy rationale articulated by the district court finds no support in Massachusetts statutory or case law. Massachusetts law recognizes only a limited public policy exception. Massachusetts General Laws ch. 175, sec. 47 provides a non-exclusive list of risks for which insurance against loss may be issued and purchased. It provides that "no company may insure any person against legal liability for causing injury, other than bodily injury, by his deliberate or intentional crime or wrongdoing." Id. sub. sixth(b).

In Andover Newton Theological School, Inc. v. Continental Casualty Co., 409 Mass. 350 (1991), the Massachusetts Supreme Judicial Court held that insurance coverage is impermissible against public policy under that provision "if an intentionally committed, wrongful act was also done deliberately or intentionally, in the sense that the actor knew that the act was wrongful." Id. at 352. This court has discussed this holding, remarking that "[i]n other words, Massachusetts law only proscribes coverage of acts committed with the specific intent to do something the law forbids." Andover Newton Theological Sch., Inc. v. Cont'l Cas. Co., 930 F.2d 89, 92 n.3 (1st Cir. 1991) (emphasis altered). There is no contention that this exception is applicable in this case even though the class action plaintiffs did allege fraud by Genzyme and certain of its officers and directors.[3]

_____

[3] The Massachusetts Supreme Judicial Court has articulated one other justification for denying coverage on public policy

-14-

The Supreme Court has made it clear that under federal law, in order for a contract to be invalidated on public policy grounds, "[s]uch a public policy . . . must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766 (1983) (quoting Muschany v. United States, 324 U.S. 49, 66 (1945)). Under Massachusetts law, courts similarly are not charged with creating amorphous public policy limitations on insurance policies.

The Massachusetts Supreme Judicial Court has stated that "'[p]ublic policy' . . . refers to a court's conviction, grounded in legislation and precedent, that denying enforcement of a contractual term is necessary to protect some aspect of the public welfare." Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., 422 Mass. 318, 321 (1996) (emphasis added). We see no basis in Massachusetts legislation or precedent for concluding that the settlement payment is uninsurable as a matter of public policy. At the same time, there are significant reasons why such an exception should not be created as a matter of public policy. Such an

_____

grounds—when the existence of loss is already known to the insured at the time that coverage is purchased. See SCA Servs., Inc. v. Transp. Ins. Co., 419 Mass. 528 (1995). This exception does not enunciate a new rule but merely reflects the truism that insurance exists to insure against unknown risks, and not against known certainties. There is no contention that this exception applies here.

-15-

exception would have the effect of making it impossible to secure coverage for damages awards in routine securities litigation that charges the corporation with unfair or unlawful treatment of a class of securities holders. Such coverage is clearly contemplated by the policy here. By its terms, the Policy provided coverage for losses that Genzyme becomes "legally obligated to pay on account of any Securities Claim . . . ." J.A. 69. A "Securities Claim" includes any Claim "brought by or on behalf of any securities holder" of Genzyme. J.A. 70. If the parties wish to exclude such coverage, it is common to include limiting provisions as was, in fact, done here in the Bump-Up clause discussed below. There is no clear public policy that would prevent the parties from including securities litigation coverage in policies, or any basis to assume that policies are designed to exclude such coverage, particularly where, as here, securities litigation is specifically mentioned in the policy and one class of claims arising from such litigation is specifically excluded by the Bump-Up clause.

In the alternative, Federal argues that the settlement payment represents restitution by Genzyme of ill-gotten gains or benefits to which Genzyme was not entitled and is therefore uninsurable. While there is no Massachusetts case recognizing this principle, in the district court Federal cited Level 3 Communications, Inc. v. Federal Insurance Company, 272 F.3d 908 (7th Cir. 2001) and its progeny to support this contention. In

Level 3, the plaintiffs alleged that Level 3 Corporation paid too little to acquire plaintiffs' interests in a business by making fraudulent representations and retained for its own benefit the amounts it ought to have paid. Level 3 settled the claim, and sought coverage under its insurance policy with Federal. The Seventh Circuit held that because the payment was "restitutionary in nature," the settlement payment was not a "loss" and therefore not insurable because the definition of loss within the meaning of an insurance contract does not "include the restoration of an ill-gotten gain." Id. at 910. When a corporation receives a benefit to which it is not entitled and is then forced to disgorge that benefit, restitution is available to remedy the unjust enrichment. Level 3 embodies the principle that a restitutionary payment is not insurable. Federal argued before the district court that Level 3 should govern this case. The district court rejected this argument because in its view, Genzyme itself received no "material benefit" in the share exchange "that could be disgorged through a restitutionary remedy." Genzyme, 657 F. Supp. 2d at 289.

We need not address the question of whether Massachusetts recognizes the exception set forth in Level 3 as we agree with the district court that this case does not fit within the framework of Level 3. This case does not present an unjust enrichment situation. Here, Genzyme obtained no identifiable asset in the share exchange and therefore the settlement payment cannot

represent the restoration to the plaintiffs of some amount Genzyme had improperly taken and withheld. Genzyme simply reorganized its capital structure by cancelling one series of stock and issuing additional shares of another series of stock, and acquired a right to cancel its tracking stocks. A corporation is neither benefitted nor harmed by issuing additional shares of stock; the issuance of additional shares has no effect on a corporation's assets or liabilities. The right to cancel shares is not an identifiable asset. Therefore, the exception articulated in Level 3 would not apply even if recognized in Massachusetts.[4]

Federal urges alternatively that a loss for insurance purposes does not occur if it derives from the fulfillment of an existing obligation. In other words, Federal argues that fulfilling a preexisting obligation through a settlement or judgment does not transform that payment into a covered "loss." See Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt., 369 F.3d 584, 590-91 (1st Cir. 2004). In Pacific Insurance, the policy holder had a contractual obligation to establish and fund certain employee accounts pursuant to a profit-sharing plan. The policy holder failed to do so and thereafter was contacted by an employee who alleged that his account had not been properly funded. Upon the

---

[4] One might argue that part of any settlement that was restitution for the directors' and officers' ill-gotten gain might be excluded under a Level-3 interpretation of the word "loss." However, Federal does not contend that the word "loss" should be interpreted to exclude these gains.

-18-

advice of counsel, who informed the policy holder that the employee would likely be successful if he chose to litigate the issue, the policy holder retroactively established and funded the accounts to the level they would have reached had the policy holder timely contributed. The insurer thereafter sought a declaratory judgment that the money contributed was not recoverable under the insurance policy. This court agreed, holding that the policy holder

> seeks reimbursement for amounts it paid--principal and interest--in satisfaction of its Plan-created obligation to establish and fund those accounts to the level they would have attained had [the policy holder] initially complied with the Plan. So understood, the cause of this obligation cannot be the breach of the obligation; instead, in our view, this obligation derived from the [Plan itself] . . . .

Id. at 590 (footnote omitted). Because the policy "does not cover debts that are 'incurred' through a contractual obligation," id. at 591, and because "[i]t makes no sense to permit a dereliction in duty to transform an uninsured liability into an insured event," id. at 593, this court held that the payment was not a loss within the meaning of policy in suit.

This case does not fall within the rule articulated by this court in Pacific Insurance. Unlike here, the dispute in Pacific Insurance involved a payment made to fulfill an explicit, preexisting contractual obligation to another party. Indeed in Pacific Insurance, this court stated that "the relevant liability for which [the policy holder] seeks recovery from its insurer is not one for breach of fiduciary duty relative to the belatedly

-19-

funded employee accounts." Id. at 590. Instead, this court noted that "the underlying obligation for which reimbursement is sought existed regardless of whether Eaton Vance first complied with its fiduciary duties or breached them." Id. at 590-91. The same cannot be said of this case. Genzyme had no concrete and identifiable preexisting contractual obligation to pay the amount of the settlement. Rather, the underlying complaint made clear that the alleged cause of the injury was in fact the breach of Genzyme's applicable fiduciary duties and/or contractual obligations. In sum, this court's holding in Pacific Insurance does not support a conclusion of uninsurability.

**IV.**

This leads us to the only provision in the policy that could provide a contractual basis for denying payment under the policy—the Bump-Up clause. It provides:

> [Federal] shall not be liable under Insuring Clause 3 for that part of Loss, other than Defense Costs . . . which is based upon, arising from, or in consequence of the actual or proposed payment by any Insured Organization of allegedly inadequate or excessive consideration in connection with its purchase of securities issued by [Genzyme].

J.A. 71 (emphases added). This clause on its face bars recovery for losses under Insuring Clause 3, other than defense costs.

-20-

We conclude, as did the district court, that the clause is applicable to payments made to settle claims made by both subclasses of shareholders. Here Genzyme itself acquired the tracking stock in exchange for General Division shares. The consideration was allegedly "inadequate or excessive" leading to a payment (i.e., a Loss) by Genzyme. The sole question is whether a "purchase" was involved. Federal argues that Genzyme "purchased" the stock from those shareholders who held the stock at the date of the cancellation and participated in the share exchange by acquiring each outstanding GZBX share in exchange for a fraction of a GENZ share.

In general, Massachusetts law presumes that words in the policy are used "in their usual and ordinary sense." Hakim v. Mass. Insurers' Insolvency Fund, 675 N.E.2d 1161, 1164 (Mass. 1997). Although ambiguities in insurance policies generally should be resolved against the insurer in favor of the insured, id. at 1165, this presumption does not apply where, as here, "the policy language results from the bargaining between sophisticated commercial parties of similar bargaining power." F.D.I.C. v. Ins. Co. of North Am., 105 F.3d 778, 786-87 (1st Cir. 1997) (applying Massachusetts law) (citation omitted).

While technically the Biosurgery Division shares were cancelled rather than surrendered, such a transaction is commonly referred to as a purchase, including in the original shareholder class action suit. Webster's Third New International Dictionary defines a purchase as "something obtained for a price in money or its equivalent." Webster's Third New International Dictionary 1845 (unabr. 2002); see also Oxford English Dictionary 860 (2d ed. 1989) (defining "purchase" as "[t]o acquire by the payment of money or its equivalent; buying"; this definition is followed by a note stating that this is "[n]ow the chief sense" in which the word is used). Here, Genzyme acquired the rights to cancel the tracking stocks. Further, Genzyme's own Articles use the verb "pay" to describe the transaction by which the shares were exchanged, and the notice sent to the class of underlying plaintiffs notifying them of the settlement described the settlement as "resolv[ing] a lawsuit over whether Genzyme Corporation and some of its current and former officers and directors caused investors to be paid too little for the GZBX shares in connection with an exchange of those shares for Genzyme General shares." J.A. 494 (emphasis added). Indeed, in Genzyme's opposition of Federal's motion to dismiss, it noted that "[t]ransactions in which corporations cancel one series

-22-

or class or shares and replace those shares with newly-issued shares are not uncommonly referred to in layman's terms as 'buy backs' or 'repurchases.'"  J.A. 579 n.4.

Nor is such an interpretation of the clause inconsistent with the purpose of the Bump-Up clause.  The Bump-Up clause was designed to exclude claims for payment in certain situations, such as in leveraged buyouts, where the company is charged with favoring one class of shareholders at the expense of another.  For example, in a leveraged buyout, the corporation might underpay the existing shareholders to benefit the remaining shareholders.  Here too, Genzyme is charged with favoring holders of General Division shares at the expense of holders of Biosurgery Division shares.

Genzyme argues that even if the Bump-Up clause were applicable to shareholders who participated in the exchange, it is inapplicable to that portion of the settlement payment made to resolve claims made by the sub-class of shareholders who sold their shares on the open market before the share exchange took place. Genzyme contends that its settlement payment to these class members does not fall within the scope of the Bump-Up provision because it never in fact purchased securities from them.

The Bump-Up provision applies to loss "arising from . . . the actual <u>or proposed</u> payment . . . of allegedly inadequate or excessive consideration in connection with [the] purchase of securities." J.A. 71 (emphasis added). Genzyme made payments to shareholders who sold in anticipation of the share exchange. These shareholders claimed that they were damaged by Genzyme's mere announcement of the <u>proposed</u> exchange. Their theory was that when Genzyme announced the share exchange, it effectively put a cap on the value of the Biosurgery Division shares. For all intents and purposes, a Biosurgery Division share was worth 0.04914 shares of GENZ stock from the moment the Share exchange was announced on May 8, 2003, even though the exchange was not scheduled to take place until almost two months later. No rational investor would purchase a Biosurgery Division share on May 9, 2003, for more than 0.04914 the value of a GENZ share if he knew that the Biosurgery Division share would simply be converted into 0.04914 GENZ shares on June 30, 2003. The settlement payments to those shareholders thus represented losses "arising from . . . a proposed payment . . . of allegedly inadequate or excessive consideration . . . ." J.A. 71.

Since the Bump-Up provision applies to both actual and proposed payments of inadequate consideration for a corporation's

own securities, Genzyme may not seek indemnification for that part of the settlement payment that went to the class members who sold into the open market.

**V.**

Genzyme also contends that the district court erred in concluding that the Bump-Up clause applies to Insuring Clause 2 (directors and officers) as well as to Clause 3 (Genzyme). We agree. On the face of the policy, the Bump-Up clause only applies to Insuring Clause 3. Thus the Bump-Up clause cannot bar Genzyme from seeking recovery under Insuring Clause 2 for any amount it paid to indemnify its officers and directors. Indeed, the allocation clause makes clear that the application of the Bump-Up Clause solely to Insuring Clause 3 was no accident. The allocation provision states that

> [i]f a Securities Claim covered, in whole or in part, under Insuring Clauses 2 or 3 results in any [director or officer] under Insuring Clause 2 or [Genzyme] under Insuring Clause 3 incurring both Loss covered hereunder and loss not covered hereunder, because such Securities Claim includes both covered and uncovered matters, [the parties] shall allocate such amount to Loss as follows: . . . [the parties] shall allocate that part of Loss subject to [certain exclusions, including the Bump-Up clause] based upon the relative legal exposure of the [directors and officers and Genzyme].

-25-

J.A. 71.  The allocation provision specifically contemplates a situation in which the Bump-Up clause would bar coverage under Insuring Clause 3, but Insuring Clause 2 would still operate to provide coverage.  Allocation would then be required.

Contrary to the explicit language in the policy, the district court concluded that the Bump-Up clause should indeed apply to Insuring Clause 2, reasoning that

> it makes little sense to allow a corporation to sidestep coverage limitations in its insurance policy through the simple expedient of claiming that a settlement payment was made to indemnify its directors and officers.  Since a corporation can only act through its corporate agents, it will often be the case that when a shareholder can bring a claim against the corporation, she can also bring one against its directors and officers. . . .  [T]he approach supported by Genzyme would encourage fraud by insured corporations . . . .

Genzyme, 657 F. Supp. 2d at 294.  In one respect, the district court is correct.  In situations where a shareholder can bring a claim against a corporation, a claim may also exist against its directors and officers.  In such situations, it will often be the case that a portion of a settlement payment is made to resolve claims against the corporation whereas another portion will be made to settle claims against directors and officers.  However, giving effect to the plain language of the policy does nothing "to allow a corporation to sidestep coverage limitations in its insurance

-26-

policy." Id. Rather, applying the Bump-Up clause to Insuring Clause 2 denies the corporation the express benefit of the insurance policy for which it paid. There is no basis in public policy for applying the Bump-Up clause to Insuring Clause 2.

Since the Bump-Up clause applies to Insuring Clause 3, but not to Insuring Clause 2, and the policy provides for allocation, we must remand to the district court to consider the allocation question. If part of the Genzyme payment represented indemnification provided to officers and directors, then such payment would appear to fall under Insuring Clause 2 and allocation of the total settlement payment is required under the policy.

The problems involved in allocation may be difficult. Other issues aside, the complaint alleged that Genzyme's directors and officers depressed the value of Biosurgery stock and Genzyme repurchased the stock for a lowered price; the same claim may therefore be stated against both the directors and officers and Genzyme – but one is covered under the insurance contract and the other is not. This may be a case where settlement, rather than lengthy and costly litigation, might be worth consideration by the parties.

**VI.**

For the foregoing reasons, we reverse the district court's grant of Federal's motion to dismiss in part. We hold that there is no public policy that prevents Genzyme from recovering under the policy but that the Bump-Up clause bars recovery of settlement amounts paid to resolve claims against Genzyme itself. On remand the district court must determine whether any amounts paid in settlement were attributable to the indemnification of the named directors and officers and, if so, determine how much of the settlement costs should be allocated to those claims. We accordingly remand to the district court for further proceedings consistent with this opinion. No costs are awarded.

**REVERSED-IN-PART AND REMANDED.**